562 F.2d 664
 183 U.S.App.D.C. 145, 19 P.U.R.4th 95
 TRANSCONTINENTAL GAS PIPE LINE CORPORATION et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent, Piedmont Natural Gas
Co., Inc., et al., Intervenors.
PIEDMONT NATURAL GAS COMPANY, INC., Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
General Motors Corp. et al., Intervenors.
ELIZABETHTOWN GAS COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, General Motors Corp.
et al., Intervenors.
CONSOLIDATED GAS SUPPLY CORPORATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Transcontinental Gas
Pipe Line et al., Intervenors. ATLANTA GAS LIGHT
COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, American Textile
Manufacturers Institute, Inc., et al.,
Intervenors. CONSOLIDATED EDISON
COMPANY OF NEW YORK, INC., Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, American Textile
Manufacturers Institute, Inc., et al.,
Intervenors. STATE OF NORTH CAROLINA
and North Carolina Utilities
Commission, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent, Piedmont Natural Gas
Company, Inc., et al., Intervenors.
 74-2036, 75-1038, 75-1045, 75-1077, 75-1099, 75-1103 and 75-1200.
 United States Court of Appeals,
District of Columbia Circuit.
 Nov. 29, 1976.
Rehearing Denied Jan. 18, 1977.
 
 Before BAZELON, Chief Judge, EDWARDS,* United States Circuit Judge for the Sixth Circuit, and MacKINNON, Circuit Judge.
 BAZELON, Chief Judge:
 
 
 1
 At issue in this case is an interim curtailment plan negotiated by the Transcontinental Gas Pipe Line Corporation (Transco) and its customers, in response to the natural gas shortage said to exist on the Transco pipe line. The plan is designed to allocate this gas shortfall among Transco's distributor customers. One element of the proposed plan is a compensation scheme, whereby those Transco customers curtailed less than the system-wide average would compensate those curtailed more than the average. The Federal Power Commission found the compensation scheme violative of the Natural Gas Act, and therefore rejected the proposed interim plan. This appeal followed.
 
 
 2
 On August 1, 1975, this court withheld consideration of this case, "until the Commission has completed its own investigation and report to this court of Transco's claims of reduced reserves...." On January 19, 1976, the Supreme Court granted certiorari, vacated this court's order, and remanded with instructions that we should:
 
 
 3
 either ... proceed to the merits of the issues presented by the compensation scheme and only thereafter deal with the adequacy of the record in regard to the evidence of shortage, or immediately remand the case to the Commission for the required inquiry.
 
 
 4
 423 U.S. 326, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976). On February 6, 1976, we followed the latter course and remanded to the Commission:[1]
 
 
 5
 [W]ell aware that the Commission has disapproved this compensation scheme rather than approved it, we do not see how we can fairly weigh the legality of that decision unless the record contains a basis for our deciding whether or not the agreement was a truly voluntary response to an actual shortage. No such basis is provided absent the Commission's investigation of the shortage question and findings of fact on this issue which can be properly reviewed by this court.
 
 
 6
 Memorandum accompanying Order of February 6, 1976, at 4-5.
 
 
 7
 Because we find that the information provided by the Commission on return of remand is still inadequate we must, reluctantly, remand the record once again.
 
 I. DEFICIENCIES ON PRIOR REMAND
 
 8
 On remand, in an attempt to expand the record to establish proof of an actual gas shortage, the parties entered into a stipulation of "facts [which] demonstrate that Transco has had, and continues to have, a necessity to curtail service to its customers...." Among the recitations was that, "The annual volume of natural gas available from Transco's producer-suppliers has been declining since 1971 and has been and continues to be, insufficient to enable Transco to satisfy the certificated requirements of its customers...." In support of the accuracy of this statement, the stipulation summarizes the affidavit of FPC staff witness, Wayne M. Thompson, a geologist in the Gas Supply and Production Section of the Bureau of Natural Gas. Thompson testified that staff initially undertook a review of the delivery capability of 18 fields connected to the Transco pipeline system and responsible for 12% of its supply. Thompson concluded that "Transco's projections of deliverability are reasonably accurate, although somewhat lower than our own." Affidavit at 2. He further concluded that "if the fields studied are representative of the entire Transco supply," then "curtailment on Transco's system will be necessary, roughly to the extent Transco itself has stated." The stipulation also recites that Thompson "stated that a further staff review of 19 additional fields accounting for approximately 9% of Transco's gas supply did not change his opinion...." Stip. at 2.
 
 
 9
 The Administrative Law Judge certified the stipulation to the Commission, along with relevant record evidence. On June 25, 1976, the Commission issued an eight-page order with these underlying materials as attachments. The principal Commission finding states,
 
 
 10
 Upon consideration of the mandate of the remand by the Court of Appeals and the record evidence properly before the Commission we find that a natural gas supply shortage has in the past and continues to exist on Transco's system which has necessitated some curtailment of service to Transco's customers.
 
 Order of June 25, 1976, at 8.[2]
 
 11
 We find that the record here, even as supplemented on remand, lacks the " 'substantial evidence' ... necessary to support any such finding [of shortage] by the Commission." 423 U.S. 331, 96 S.Ct. 582 (1976). This court has previously suggested that the existence and legitimacy of shortage on the Transco system could best be proven by thorough examination of the pipeline's proved reserves. But the Commission order on remand, while finding that a natural gas supply shortage has existed and continues to exist, does so exclusively in terms of "deliverability." The Commission states that "deliverability (the amount of gas capable of delivery in a fixed time period) evidence is more relevant to the issue of need for curtailment than is evidence on total proved reserves." Order, supra, at 7. Deliverability may, indeed, be "more relevant" to the question of whether curtailment is required on any given day; however, it seems clear that at least some explanation of the relationship between Transco's present deliverability crisis and its proved reserves, and the reasons for Transco's alleged inability to bring sufficient gas onstream, is required in order for the Commission and a reviewing court to be able to assess the nature, extent, and duration of shortage.
 
 
 12
 Diminished deliverability does not necessarily constitute substantial evidence of actual and legitimate long-term shortage if, for example, a pipeline or producer could, by more or less simple acts, make its proved reserves more deliverable. Similarly, diminished proved reserves may not support a finding of long-run shortage if by physically and economically achievable acts lying entirely within the control of a pipeline or producer, sizeable reservoirs of gas might be moved from the "possible" or "probable" categories into the category of "proved reserves".[3]
 
 
 13
 In a related context, the Commission has noted that the need for curtailment may arise in two legally distinct situations. In the first, reduction of service comes about because of government-ordered curtailment "necessary as a result of the [legitimate] gas shortage." In the second, "the pipeline's need to curtail resulted from its own negligence, bad faith, or other wrongful conduct." See United Gas Pipeline Co., 49 F.P.C. 1211, 1220 (1973). We fail to see how the Commission can distinguish between these two shortfall conditions employing deliverability data alone.
 
 
 14
 However, even assuming that the deliverability data now in the record constituted proof of Transco's immediate shortage sufficient to justify curtailment of some sort, a determination of the legality of compensation would require a broader base of information.
 
 II. SCOPE OF THE PRESENT REMAND OF RECORD
 
 15
 Because of ambiguities in the Commission orders of November 12, 1974, and January 10, 1975, we are unable to determine whether the Commission concluded that all like compensation plans employed in the context of end-use curtailment would be barred by the Act, or whether instead it concluded only that this particular plan is improper.[4] But whether the opinions are intended to be read broadly or narrowly, we believe it is clear that any proposed compensation plan cannot be measured against the strictures of Sec. 4 of the Act[5] without substantial information regarding the duration, shape and causation of the alleged shortage on the Transco system. Such information is simply not provided by deliverability data alone. We believe that the legality of compensation may well turn, at least in part, on answers to the following sorts of questions: Are sufficient volumes of gas available as proved or provable reserves so that greater total deliverability can be foreseen in the short-term future? Are present levels of curtailment likely to continue for the indefinite future, or to deepen? And more specifically: will compensation be a short-term financial adjustment between customers of the pipeline to keep some of those customers financially afloat until the supply situation stabilizes, or will it be a permanent cross-subsidization? We believe that without such information, neither the Commission nor the court can hope to give meaning to statutory terms such as "rates," "charges," and "classes of service" in a regulatory landscape vastly altered by end-use curtailment.
 
 III. CONCLUSION
 
 16
 In remanding the case to this court, the Supreme Court noted, "... it is at least conceivable that the Court of Appeals could determine that the lawfulness of the proposed compensation scheme is partially a function of the actual severity of the shortage." 423 U.S. 334, 96 S.Ct. 584 (1976). This court has so determined, as we suggested in our order of February 6, 1976. The additional information we now require in this second remand of the record is necessary to determine how Transco is marshalling its resources and proved and provable reserves to produce maximum deliverability in the future. Only when the anticipated duration and shape of the shortage is in better perspective will this court be able to assess the legality of the compensation scheme at issue here. The Clerk is instructed to remand the record herein to the Federal Power Commission for supplementation in accordance with this opinion.
 
 
 17
 So ordered.
 
 MacKINNON, Circuit Judge (dissenting):
 
 18
 The foregoing opinion finds it necessary to again remand this case (rather the record) to the Federal Power Commission. The stated objective of such a remand is
 
 
 19
 to determine how Transco is marshaling its resources and proved and provable[1] reserves to produce maximum deliverability in the future. Only when the anticipated duration and shape of the shortage is in better perspective will this court be able to assess the legality of the compensation scheme at issue here.
 
 
 20
 Majority op. p. --- of 183 U.S.App.D.C., p. 669 of 562 F.2d (emphasis added).
 
 
 21
 In my view the foregoing misconceives the issues here and this court's ability to deal with them.
 
 
 22
 This court has before it a curtailment plan involving a compensation scheme. If the compensation scheme is invalid the entire curtailment plan falls and it would be unnecessary to consider any of the facts and issues that the remand directs the Commission to determine and consider. However, the majority, apparently obsessed with the idea that there is no actual gas or oil shortage,[1] have taken the bit in their teeth and sua sponte determined to compel the Commission to make an extensive and complex investigation, study and report on that issue. This same effort is being substantially duplicated for other gas producing areas by Congress, Ashland Oil, Inc. v. FTC, 179 U.S.App.D.C. 22, 548 F.2d 977 (1976), and other agencies, FTC v. Texaco, Inc., 170 U.S.App.D.C. 323, 517 F.2d 137 (1975), vacated pending rehearing en banc (Feb. 6, 1976).
 
 
 23
 In determining that it has the right to do this, the majority hangs on the strict language of the sentence in the Supreme Court remand order which, inter alia, states:
 
 
 24
 [I]t is at least conceivable ... that the lawfulness of the proposed compensation scheme is partially a function of the actual severity of the shortage.
 
 
 25
 FPC v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 334, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976) (emphasis added).
 
 
 26
 However, to my mind, the reliance of the majority does not fully consider the import of the Supreme Court order. First, to the extent that the Supreme Court supported the theory of the majority it did so by saying it was only "conceivable." That is not much support. Second, the Supreme Court recognized that the validity of the compensation scheme was, at best, dependent only "partially [on] ... the actual severity of the shortage." Id. This recognizes that this court could pass on that part of the plan that involved the validity of any computation scheme inter sese without the necessity of determining the existence or non-existence or exact extent of a gas shortage on the line. In fact, the two alternatives which the Supreme Court gave this court on remand[2] are another recognition that it was not necessary to pass on the validity or extent of the gas shortage in order to rule that the plan was invalid because the Natural Gas Act does not permit the incorporation of any compensation scheme. Third, when the Supreme Court referred to the "lawfulness of the proposed compensation scheme" (emphasis added) as being only "partially a function of the actual severity of the shortage" (emphasis added), it indicated to me that it recognized that (1) the Commission might find the scheme to be lawful under the Natural Gas Act, but that (2) in its application to curtailed users, the same plan might at some later date be determined to involve an unlawful breach of their contracts because of Transco's "negligence, bad faith, or other wrongful conduct." This conduct might then also be found to violate the Natural Gas Act even though the Commission had previously approved the plan.
 
 
 27
 In my view of the present proceedings, none of the parties has raised any issue as to the lawfulness of the application of the plan to particular parties or in particular circumstances. Transco started back over 5 years ago on May 17, 1971, responding to the Commission's Order No. 431 to file proposed permanent curtailment plans for use in such future shortages as might arise. The presently proposed curtailment plan is a continuation of that original start as modified by subsequent alterations and such orders of the Commission and of this court as have compelled it to alter its plans. Also, the parties eventually negotiated a settlement among themselves involving the presently questioned compensation scheme.
 
 
 28
 The principal concern of the parties and the Commission with the plan is the validity of any compensation scheme in a curtailment plan in which priorities are based wholly or in part on end use criteria. And the inherent validity of such a compensation scheme is not dependent upon the existence of any particular degree of shortage, real or spurious. The plan is to be applied over a wide range of possible degrees of shortages. If Transco has curtailed its customers in the past, or does so in the future, because of any shortage which is fictitious or self-induced, or in any way wrongful, it can be sued for damages. Alternatively, parties aggrieved could conceivably petition the Commission for relief. But that is not this case and such issues have not been raised and cannot be decided on this record. We are restricted to acting on the basis of the record before us. However material the bona fides of a particular gas shortage might be to litigation involving the application of a curtailment plan to particular parties in particular circumstances, it is not "absolutely essential to a decision by [this court] on the issues presently before [this] court for review," FPC v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 334, 96 S.Ct. 579, 584, 46 L.Ed.2d 533 (1976), i.e., to the validity of a monetary compensation scheme in a curtailment plan based on end use criteria. The question as to the bona fides of the shortage, and possibly the bona fide character of various degrees of shortages, that the majority now seek to interject into the proceeding for a Commission determination should be left to a more appropriate time and proceeding. So far as the parties are concerned, they have not raised any of these issues in this proceeding, and the determination of proved and provable reserves which the majority order by the present remand is premature and might never be required if this court passed on the issue involving the facial validity of the compensation scheme.
 
 
 29
 As previously indicated, the compensation scheme which was negotiated with Transco's customers would be invalid if Transco fraudulently misrepresented the existence or extent of a gas shortage, and the customers relied thereon in agreeing to the scheme and thereby suffered damage. But the more immediate question, and the one raised in this proceeding by those priority customers of Transco who would be required to pay compensation to lower priority customers, is whether the compensation scheme, per se, creates an "unreasonable difference in rates, charges, service .. or in any other respect ... as between classes of service." 15 U.S.C. Sec. 717c(b) (1970). The Commission determined that the scheme was a facial violation of the Act. That issue can easily be ruled on by this court, right now, without any further delay and inconvenience to the parties and to the Commission and without the necessity of determining the amount of proved reserves, provable reserves, reserves economically achievable by acts lying wholly within the control of a pipeline or producer, etc. In my opinion we should rule on the merits of the facial validity of the compensation scheme before the Commission is forced to make the exceptionally complex findings and prophecies[3] that the majority orders, because if we find the scheme to be facially invalid there is no necessity for the additional investigation. Certainly such procedure would work an economy of the time of this court and all parties concerned. A finding that the compensation scheme of the plan violated the Act would doom the entire plan for unlawfulness and no second reason for reaching the same conclusion would be necessary.
 
 
 30
 The majority assert that answering some of the questions "would be difficult" and that the meaning of the phrase "classes of service" is unclear.[4] Apparently the majority has some initial difficulty with whether the compensation called for by the compensation scheme is subject to regulation by the Commission. On the latter point the majority cites a Fifth Circuit case as holding that compensation payments do not constitute "rates," i.e., "[C]ompensation payments are not 'rates' but in the nature of surcharges...."[5] (Emphasis added.) Well, the statute says "rates" and "charges" and certainly the majority would not have any great difficulty in holding that a "surcharge" is a "charge." And as to whether "classes of service" are involved, the cases on permissible classification run into the thousands.
 
 
 31
 It is thus clear that the majority are overcomplicating the case, unreasonably burdening the parties without any assurance that it is necessary to do so, and unreasonably delaying a decision on the facial validity of the compensation scheme. Nothing would be lost by this panel immediately coming to grips with that issue and deciding it. If we decided the scheme was invalid the further inquiry would be unnecessary. If we decided the scheme was facially valid then the majority could remand for such additional information as they desired. That is the sensible way to approach the situation.[6] In addition to the foregoing I do not find that the majority has fairly considered the record furnished by the Commission in response to the remand and I also object to the indefinite and imprecise nature of the second remand that the majority now orders.
 
 
 32
 I respectfully dissent.
 
 
 
 *
 Sitting by designation pursuant to Title 28 U.S.C. Sec. 291(a)
 
 
 [1]
 Notwithstanding our local Rule 13(d) governing remands "of the record" and "of the case" or the specific Supreme Court language we quoted in our February 6 order, and in light of the Supreme Court's purpose here of remand for supplementation of the record, we do not read our prior order as surrendering jurisdiction. Upon the Commission's motion to lodge its order of June 25, 1976 and attached documents, the court determines to treat the motion as a motion to file and to supplement the record in a case over which it has on-going jurisdiction, and as such grants it
 
 
 [2]
 This finding negates the dissenter's view that "If Transco has curtailed its customers in the past, or does so in the future, because of any shortage which is fictitious or self-induced, or in any way wrongful, it can be sued for damages." Dissent at 4. We note that a recent FPC news release indicates that in the gas year just ended (April 1975-March 1976), Transco was curtailing 35% of firm requirements systemwide. FPC Report of June 18, 1976 on 1976-77 Projected Natural Gas Pipeline Curtailments, Schedule I of Bureau of Natural Gas Staff Report. For the current gas year (April 1976-March 1977), Transco projects a deficiency of 42.98% of firm requirements. Id. Plainly the question of whether a shortage is "ficitous," "self-induced," or "in any way wrongful" is not simply a related or future question, but goes to the heart of the propriety of compensation
 
 
 [3]
 Gas which could be so moved into "proved reserves" will be termed "provable" throughout this opinion
 
 
 [4]
 There would appear to be serious questions about the validity of a broad ban on all compensation plans. See Mississipii Public Service Commission v. FPC, 522 F.2d 1345 (5th Cir.1975), cert. denied, 429 U.S. 870, 97 S.Ct. 181, 50 L.Ed. 149. In that case the Fifth Circuit set aside an FPC order denying extraordinary relief from a curtailment plan. The relief sought consisted of a compensation plan, and the Commission denied the relief because it concluded that it lacked jurisdiction to order or approve any plan of compensation. The court disagreed, holding that "the imposition of compensation payments as a condition for the receipt of higher priority gas is within the statutory power of the FPC...." Id. at 1350
 
 
 [5]
 The overarching requirement of the Natural Gas Act is that all rates and charges by natural gas companies subject to FPC jurisdiction, and all governing rules and regulations, must be "just and reasonable," and those that are not are deemed unlawful. Sec. 4(a). Under the compensation plan at issue in the instant case, the pipeline's distributor customers would pay differing prices for gas depending upon whether they were being curtailed more or less than the systemwide average. A threshold determination, therefore, would be whether the financial burdens and benefits related to compensation constitute "rates" or "charges" within the reach of Sec. 4(a) for regulatory purposes
 Although we need not now reach this issue, we note that the Fifth Circuit has determined that such payments do not constitute "rates": "[C]ompensation payments are not 'rates' but in the nature of surcharges imposed in the context of a curtailment plan to insure that the burdens of curtailment are spread evenly and equitably among those affected...." Mississippi Public Service Commission, supra, at 1350. The court suggested that "compensation plans are more analogous to the penalty payments included by the Commission in various curtailment plans to deal with the problem of overtakes." Id. "Surcharges" and "penalty payments," however, suggest limited application of a pricing mechanism for a short duration to achieve a clearly defined purpose; higher prices for gas sold as emergency relief or improperly taken in excess of curtailment, may not necessarily be analogous to varying permanent prices for gas allocated by the curtailment plan itself.
 Assuming that compensation payments were found to be regulable "rates" or "charges," they would have to meet the non-discrimination requirements of Sec. 4(b) of the Act, as well as the "just and reasonable" test of Sec. 4(a). Section 4(b) provides:
 (b) No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect as between localities or classes of service.
 15 U.S.C. Sec. 717c. Determining whether compensation fees (if held to be regulable "rates" or "charges") constitute undue preference or disadvantage, or involve unreasonable differences as between localities or classes of service would be difficult. It is unclear, in the context of deep end-use curtailment, what the statutory phrase "classes of service" has come to mean. For example, when two distributor customers of a pipeline have vastly different consumer loads, one with mostly high priority volumes and transacting near-normal business, the other selling almost no gas because its mostly low priority volumes have been fully curtailed, are they similarly situated from the perspective of Sec. 4(b)(2) simply because the underlying contractual terms of sale from the regulated pipeline are identical? Upon decision of this question may turn the lawfulness of differing gas prices charged those distributor customers under compensation.
 
 
 [1]
 Originally the majority were concerned with "proved reserves" (Majority op. p. --- of 183 U.S.App.D.C., p. 668 of 562 F.2d), which term has a precise meaning in the accepted geological and engineering concepts and methods used throughout the oil and gas industry, i.e.:
 [P]roved reserves [are] the current estimated quantity of natural gas and natural gas liquids which analysis of geologic and engineering data demonstrate with reasonable certainty to be recoverable in the future from known oil and gas reservoirs under existing economic and operating conditions. Reservoirs are considered proved that have demonstrated the ability to produce by either actual production or conclusive formation test.
 The area of reservoir considered proved is that portion delineated by drilling and defined by gas-oil, gas-water contacts or limited by the structural deformation or lenticularity of the reservoir. In the absence of fluid contacts, the lowest known structural occurrency of hydrocarbons controls the proved limits of the reservoir. The proved area of a reservoir may also include the adjoining portions not delineated by drilling but which can be evaluated as economically productive on the basis of geological and engineering data available at the time the estimate is made. Therefore, the reserves reported ... should include total proved reserves which may be in either the drilled or undrilled portions of the field or reservoir.
 
 
 [28]
 American Gas Ass'n, Reserves of Crude Oil, Natural Gas Liquids, and Natural Gas 102 (1974)
 [P]roved reserves ... include gas and natural gas reserves of all types regardless of size, availability of market, ultimate disposition or use.
 Id. at 96-97. The majority now expand their prior remand to include so-called "provable reserves"--not just proved reserves. The industry reports (id.) do not refer to any such classification. So unless some industry support can be cited for the term "provable reserves," it must be concluded that the majority have coined an ad hoc definition and gratuitously endowed it with their own non-scientific trappings. They define it to mean sizeable reservoirs of gas which might be moved from the "possible" or "probable" categories (both undefined) into the category of "proved reserves" by "physically and economically achievable acts lying wholly within the control of a pipeline or producer." Majority op. p. --- & n. 3 of 183 U.S.App.D.C., p. 668 & n. 3 of 562 F.2d. The term "proved reserves" already includes considerable quantities of natural gas that are not absolutely proved and which may be said to involve some degree of "possibility" or "probability"--such as reserves in the "undrilled portions of the field or reservoir." American Gas Assn., supra at 102.
 How much more "possible" or "probable" the majority want the Commission to go in their now expanded effort to find some additional basis for supporting the remand, they do not say. Whether this attempt by the majority to now expand the inquiry into this nebulous area is practical remains to be seen. At the present time no industry or scientific support has been cited to justify it. If the Commission or the parties considered this request to be impractical, they can move for its modification.
 
 
 [2]
 [T]he court below is free on remand either to proceed to the merits on the issues presented by the compensation scheme and only thereafter deal with the adequacy of the record in regard to the evidence of shortage, or immediately to remand the case to the Commission for the required inquiry
 423 U.S. at 334, 96 S.Ct. at 584, quoted in majority op. p. --- of 183 U.S.App.D.C., p. 666 of 562 F.2d.
 
 
 [3]
 The majority assert:
 We believe that the legality of compensation may well turn, at least in part, on answers to the following sorts of questions: Are sufficient volumes of gas available as proved or provable reserves so that greater total deliverability can be foreseen in the short-term future? Are present levels of curtailment likely to continue for the indefinite future, or to deepen? And more specifically: will compensation be a short-term financial adjustment between customers of the pipeline to keep some of those customers financially afloat until the supply situation stabilizes, or will it be a permanent cross-subsidization? We believe that without such information, neither the Commission nor the court can hope to give meaning to statutory terms such as "rates," "charges," and "classes of service" in a regulatory landscape vastly altered by end-use curtailment.
 Majority op. p. --- of 183 U.S.App.D.C., p. 669 of 562 F.2d (emphasis added).
 
 
 [4]
 Majority op. p. --- n. 5 of 183 U.S.App.D.C., pp. 668-669 n. 5 of 562 F.2d
 
 
 [5]
 Mississippi Public Service Commission v. FPC, 522 F.2d 1345, 1350 (5th Cir.1975), cert. denied, 429 U.S. 870, 97 S.Ct. 181, 50 L.Ed.2d 149 (1976), quoted in majority op. p. --- n. 5 of 183 U.S.App.D.C., p. 668 n. 5 of 562 F.2d
 
 
 [6]
 It is argued that the FPC should not consider the compensation agreement without first determining that there is a legitimate shortage. To my mind that question should be explored and determined when it is raised by the parties--and certainly not when the Commission has found the scheme to be invalid for other reasons which made it unnecessary to determine the existence of a legitimate shortage
 I would pass on the case that was presented to us by the parties. In that respect I would apply the Supreme Court's finding that the majority "overstepped the bounds of its reviewing authority ... [by not confining its review] to 'consideration of the decision of the agency ... and of the evidence on which it was based.' U.S. v. Carlo Bianchi & Co., 373 U.S. 709, 714-715, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963)." FPC v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 331, 96 S.Ct. at 582 (1976).