CITY OF WILLCOX and Arizona Electric Power Cooperative, Inc., Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

San Diego Gas & Electric Co., American Smelting and Refining Co., et al., Southern Union Gas Co., General Motors Corporation, El Paso Natural Gas Co., Navajo Tribal Utility Authority, Department of Water and Power, etc., The People of the State of California, etc., Tucson Gas & Electric Co., Pacific Gas & Electric Co., Nevada Power Company, Southwest Gas Corporation, Southwest Natural Gas Consumers, Arizona Fuel Users Association, Pioneer Natural Gas Co., Intervenors.

ARIZONA PUBLIC SERVICE COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent,

San Diego Gas & Electric Co., City of Willcox, Arizona and Arizona Electric Power Coop., Inc., American Smelting and Refining Co., et al., Southern Union Gas Co., Navajo Tribal Utility Authority, General Motors Corporation, Tucson Gas & Electric Co., Pacific Gas & Electric Co., Southern California Edison Co., El Paso Natural Gas Co., People of the State of California and the Public Utilities Commission of the State of California, Nevada Power Company, Southern California Gas Co., Southwest Natural Gas Consumers, Southwest Gas Corporation, Arizona Fuel Users Asso., Pioneer Natural Gas Co., Intervenors.

NEVADA POWER COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent,

American Smelting & Refining Co, et al., General Motors Corp., Tucson Gas & Electric Co., Southern California Gas Co., San Diego Gas & Electric Co., Pacific Gas & Electric Co., City of Willcox Arizona and Arizona Electric Power Coop., Inc., Navajo Tribal Utility Authority, People of the State of California and the Public Utilities Commission of the State of California, El Paso Natural Gas Co., Salt River Project Agricultural Improvement and Power District, Southwest Gas Corp., Southern Union Gas Co., Southern California Edison Co., Southwest Natural Gas Consumers, Arizona Fuel Users Asso., Pioneer Natural Gas Co., Intervenors.

PACIFIC GAS AND ELECTRIC COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent,

Southern Union Gas Co., City of Willcox Arizona, et al., Navajo Tribal Utility Authority, American Smelting and Refining Co., et al., Southwest Gas Corp., The People of the State of California, et al., El Paso Natural Gas Co., General Motors Corporation, Southern California Edison Company, Arizona Public Service Co., Nevada Power Co., Tucson Gas and Electric Co., Intervenors.

SAN DIEGO GAS & ELECTRIC COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent,

Southern Union Gas Co., City of Willcox, etc., People of the State of California, et al., General Motors Corporation, Pacific Gas & Electric Co., Navajo Tribal Utility Authority, El Paso Natural Gas Co., Southwest Gas Corp., Southern California Edison Co., Nevada Power Company, American Smelting and Refining Co., et al., Arizona Public Service Co., Tucson Gas & Electric Co., Southwest Natural Gas Consumers, Arizona Fuel Users Association, Pioneer Natural Gas Co., Intervenors.

395

SOUTHERN CALIFORNIA GAS
COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

San Diego Gas, et al., Southern Union Gas Co., City of Willcox, etc., Department of Water and Power of the City of Los Angeles, The People of the State of California, et al., Pacific Gas and Electric Co., Navajo Tribal Utility Authority, El Paso Natural Gas Co., General Motors Corporation, Southern California Edison Co., American Smelting and Refining Co., Arizona Public Service Co., Southwest Gas Corp., Nevada Power Company, Tucson Gas & Electric Co., Southwest Natural Gas Consumers, Arizona Fuel Users Asso., Pioneer Natural Gas Co., Intervenors.

SOUTHERN CALIFORNIA EDISON
COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Nevada Power Co., El Paso Natural Gas Co., The People of the State of California, et al., San Diego Gas and Electric Co., American Smelting and Refining Co., et al., Navajo Tribal Utility Authority, Pacific Gas and Electric Co., Tucson Gas and Electric Co., Southwest Natural Gas Consumers, Arizona Fuel Users Association, Pioneer Natural Gas Co., Intervenors.

Nos. 74-2123, 75-1019, 75-1062, 75-1245, 75-1246-75-1248.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 13, 1976.

Decided June 30, 1977.

On Motions for Clarification and Denial of
Rehearing Aug. 18, 1977.

Certiorari Denied Jan. 9, 1978.
See 98 S.Ct. 724.

David R. Straus, Washington, D. C., was on the brief, for petitioner in No. 74–2123 and intervenors City of Willcox and Arizona Elec. Power Coop.

Arnold D. Berkeley, Washington, D.C., was on the motion of intervenors petitioners, City of Willcox and Arizona Power Cooperative. Inc., for stay of second interim curtailment plan, was on the reply of petitioners, City of Willcox and Arizona Electric Power Cooperative, Inc., to oppositions to the motion for stay of second interim curtailment plan, and was on the petition for rehearing of petitioners, City of Willcox and Arizona Electric Power Cooperative, Inc.

Peyton G. Bowman, III, Washington, D. C., with whom C. Floyd Mathews, Washington, D. C., was on the brief, for petitioner in No. 75–1019.

Arnold Fieldman, Washington, D. C., with whom Reuben Goldberg, Washington, D. C., was on the brief, for petitioner in No. 75–1062 and intervenor Nevada Power Co.

Howard V. Golub, New York City, with whom Malcolm H. Furbush, San Francisco, Cal., was on the brief, and on the petition for rehearing for petitioner in No. 75–1245 and intervenor Pacific Gas and Elec. Co. Daniel E. Gibson, Oakland, Cal., entered an appearance for intervenor PG&E Co.

Rollin E. Woodbury, Rosemead, Cal., with whom H. Robert Barnes, Alan M. Nedry,

Rosemead, Cal., Edward C. Farrell and Arthur T. Devine, Los Angeles, Cal., were on the brief, for petitioner in No. 75–1248 and intervenors Southern California Edison Co. and Dept. of Water and Power of the City of Los Angeles. Frederick H. Ritts, Washington, D.C., entered an appearance for Dept. of Water and Power of the City of Los Angeles.

John H. Burnes, Jr., Atty., F. P. C., Washington, D. C., with whom Robert W. Perdue, Deputy Gen. Counsel, Washington, D. C., were on the brief, for respondent. George W. McHenry, Jr., Sol., F. P. C., Washington, D. C., at the time the record was filed, also entered an appearance for respondent. Richard C. Steffey and William J. Grealis, Attys., F. P. C., Washington, D. C., entered an appearance for respondent.

Drexel D. Journey, Gen. Counsel, and Allan Abbot Tuttle, Sol., F.P.C., Washington, D. C., were on the brief, and on the response of the respondent, Federal Power Commission, to motion for stay.

Harris S. Wood, El Paso, Tex., was on the brief, for intervenor El Paso Natural Gas Co.

Thomas M. Walsh, Washington, D. C., was on the response of respondent, Federal Power Commission, to motion for stay. C. Frank Reifsnyder, Washington, D. C., was on the brief and on the petition for rehearing of intervenor, El Paso Natural Gas Co.

George W. Wise, Washington, D. C., was on the petition for rehearing of intervenor, El Paso Natural Gas Co.

Edward J. Grenier, Jr., Washington, D. C., with whom Frazer F. Hilder, Detroit, Mich., was on the brief, for intervenor General Motors Corp. Richard J. Pierre, Jr. and Richard P. Noland, Washington, D. C., also entered an appearance for intervenor General Motors Corp.

Randolph W. Deutsch, San Francisco, Cal., with whom Richard D. Gravelle and J. Calvin Simpson, San Francisco, Cal., were on the brief, for intervenors People of the State of California and the Public Utilities Commission of the State of Cal. John S. Fick, San Francisco, Cal., also entered an appearance for intervenors People of the State of California and Public Utilities Commission of the State of Cal.

David R. Pigott, San Francisco, Cal., was on the brief for petitioner in No. 75–1246. Donald J. Richardson, Jr., San Francisco, Cal., also entered an appearance for petitioner in No. 75–1246 and intervenor San Diego Gas and Elec. Co.

Jeffrey A. Meith, Los Angeles, Cal., also entered an appearance for intervenor Southern California Gas Co.

Thomas D. Clarke, Los Angeles, Cal., was on the response of petitioners, on the brief for petitioner in No. 75–1247 and intervenor Southern California Gas Co., to motion for stay of second interim curtailment plan, was on the answer of petitioner, Southern California Gas Co., to reply to petitioners (City of Willcox and Arizona Power Cooperative, Inc.) for stay of second interim curtailment plan, and was on the petition for rehearing of petitioner, Southern California Gas Co.

Jerome Ackerman, Bingham B. Leverich and Nicholas W. Fels, Washington, D. C., were on the brief for intervenors American Smelting and Refining Co., et al. James R. McCotter, Washington, D. C., also entered an appearance for intervenors American Smelting and Refining Co., et al. Cameron R. Graham, Albuquerque, N. M., Robert J. Haggerty, Washington, D. C., A. S. Grenier, Dallas, Tex. and Phil W. Jordan, Washington, D. C., were on the brief for intervenors Pioneer Natural Gas Co., Southern Union Gas Co. and Southwest Natural Gas Consumers. Constance L. Howard and Charles H. McCrea, Las Vegas, Nev., entered an appearance for intervenor Southwest Gas Corp. John T. Ketcham, Washington, D. C., entered an appearance for intervenor Pioneer Natural Gas Co.

Lawrence V. Robertson, Jr., Las Vegas, Nev., Thomas F. Brosnan, Washington, D. C. and John F. Harrington, Washington, D. C., were on the brief for intervenor Tucson Gas and Elec. Co.

Cameron R. Graham, Albuquerque, N. M., was on the brief for intervenor Southwest Natural Gas Consumers.

Richard H. Silverman, Phoenix, Ariz., was on the brief and on the motion of intervenor Salt River Project, Agricultural Improvement and Power District in No. 75–1052. Joel L. Green, Washington, D.C., entered an appearance and was on the motion for intervenor Salt River Project, Agricultural Improvement and Power District in No. 75–1062.

David B. Graham, Washington, D.C., filed a brief on behalf of Natural Rural Electric Cooperative Ass'n, as amicus curiae urging affirmance.

Walter F. Wolf, Jr., Washington D.C., entered an appearance for intervenor Navajo Tribal Utility Authority.

James R. Bieke, Washington, D.C., entered an appearance for intervenor Arizona Fuel Users Ass'n.

Before BAZELON, Chief Judge, and TAMM and MacKINNON, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

Opinion filed by BAZELON, Chief Judge, concurring in part and dissenting in part.

MacKINNON, Circuit Judge:

The natural gas shortage necessitating curtailment of deliveries on the El Paso Natural Gas System is the subject of the present appeal. Recognizing that decreasing availability would soon cause severe hardship, the Federal Power Commission issued Order No. 431 in April of 1971. By that order, all jurisdictional pipelines were required to file new tariffs with the Commission to provide for rationing of natural gas among eventual users. El Paso complied on July 6, 1971, submitting a contingency plan that allocated scarce natural gas according to the ultimate consumers' contracts with their suppliers, and reflecting the total amounts of gas that the consumers had used in the past.

In August of 1972, after hearings had been held before the FPC, the original proposal was withdrawn. El Paso requested the FPC to issue an interim curtailment plan, to be effective until a permanent plan could issue. On October 31, 1972, the Commission released Opinion No. 634 (J.A. 315, Tr. 13355) which established an interim plan, awarding natural gas allotments to the various distributors on the basis of the eventual use to which the gas would be put. A modification followed with Opinion No. 634A (J.A. 339, Tr. 13746), issued on December 15, 1972. The challenge to this interim plan was decided in *American Smelting and Refining Co. v. FPC*, 161 U.S.App.D.C. 6, 494 F.2d 925, *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974) (hereinafter, "*ASARCO*"). The attack was made by many of the same petitioners here and was, in large part, sustained.

On June 14, 1974, a permanent curtailment plan was announced for the El Paso System. *See* Opinion No. 697 (J.A. 411, Tr. 16587). Once again, a supplementary opinion was required; this was issued in Opinion No. 697A on December 19, 1974 (J.A. 484, Tr. 17080). Opinion No. 697 was also an "end-use" curtailment plan. It was ordered to be treated only as an interim plan (in Opinion No. 697A), until an environmental impact statement had been completed. El Paso was required to file a set of revised tariffs in keeping with Opinions No. 697 and 697A.[1] That is the present status of the plan.

Opinions No. 697 and 697A classify all ultimate users of natural gas into five priorities, with residential and small commercial users receiving top priority, and large volume industrial boiler users with alter-

---

1. The ripeness aspects of this situation are discussed in Part VI, 185 U.S.App.D.C. p. ——, 567 F.2d p. 414, *infra*.

nate fuel capabilities receiving lowest priority.[2]

Seven petitioners now press objections to the proposed permanent curtailment plan.[3] Fifteen other parties have intervened as *amici curiae.*[4] Many conflicting objections are raised, some of which have merit. Eight questioned areas will be separately addressed. In our review the Federal Power Commission's authority is to be especially respected in matters of policy and logistics; consistency must be maintained in applying the Commission's policy judgments; complaints rooted in particular circumstances can best be treated on specific application for relief by the concerned parties to the Commission; and the settled law from this circuit and others which have addressed curtailment will, in the absence of impor-

tantly different circumstances, govern the resolution of complaints raised here.

## I. SCOPE OF REVIEW

Initially, there is some dispute as to what provision of the Natural Gas Act provides the Federal Power Commission with the authority to review and promulgate curtailment plans. In Opinion No. 634, dealing with an interim curtailment plan, the Commission cited *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972), which upheld the Commission's authority to issue Order No. 431 requesting natural gas distributors to file curtailment plans. "While that affirmance was based primarily upon a tariff filing under Section 4 of the Natural Gas Act," the FPC stated in Opinion No. 634, "we are also operating pursuant to Section 5[5] and

2. Subject to the modifications of Opinion No. 697A, the priorities announced by the FPC for El Paso are:
    *Priority 1.* Residential, small commercial (less than 50 Mcf on a peak day).
    *Priority 2.* Large commercial requirements (50 Mcf or more on a peak day), industrial requirements for plant protection, feedstock and process needs, and pipeline customer storage injection requirements.
    *Priority 3.* All industrial requirements not specified in Priorities 2, 4 and 5.
    *Priority 4.* Industrial requirements for boiler fuel use at less than 3,000 Mcf per day, but more than 1,500 Mcf per day, where alternate fuel capabilities can meet such requirements.
    *Priority 5.* Industrial requirements for large volume (in excess of 3,000 Mcf per day) boiler-fuel use where alternate fuel capabilities can meet such requirements.
    (Opinion No. 697, J.A. 424–25, Tr. 16599).

3. They are:
    City of Willcox and Arizona Electric Power Cooperative, Inc.
    Arizona Public Service Company
    Nevada Power Company
    Pacific Gas and Electric Company
    San Diego Gas and Electric Company
    Southern California Gas Company
    Southern California Edison Company

4. They are:
    El Paso Natural Gas
    Salt River Project Agricultural Improvement and Power District
    Tucson Gas & Electric Co.
    ASARCO
    Compania Minera de Cananea, S.A. de C.V.

Inspiration Consolidated Copper Co.
Kennecott Copper Corp.
Pioneer Natural Gas Co.
Southern Union Gas Co.
National Rural Electric Cooperative Ass'n
Southwest Natural Gas Consumers
Nevada Power Co.
General Motors Co.
People of the State of California
Public Utilities Commission of the State of California
In addition, several of the petitioner also filed *amicus* briefs:
    City of Willcox and Arizona Electric Power Cooperative, Inc.
    Pacific Gas and Electric Company
    Southern California Gas Company

5. 15 U.S.C. § 717d(a) (1970) provides:
    (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such in-

16 [6] of the Act in this case." (Footnotes inserted.)

█ When Opinion No. 634 was before this court in *ASARCO*, we held that although section 16 of the Act empowered the Commission to alter and promulgate proposed curtailment plans, that section required reliance on section 5(a) of the Act as a "core section" to provide the substantive counterpart to section 16's procedural authority. The brief of El Paso as intervenor argues that the permanent curtailment plan, unlike the interim plan, was premised on section 4 of the Act as the "core section," but there is no basis for this in the Commission's Orders No. 697 or 697A. Nor could there be, since the Commission in these orders is imposing its changes on the curtailment plans, rather than merely suspending El Paso's proposed plan. For the purpose of imposing an alternate plan, section 5 is necessary. "Whenever the Commission . . . shall find that any . . . classification . . . or that any rule, regulation, practice, or contract affecting such . . . classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable . . . classification, . . . practice, or contract to be thereafter observed and in force, and shall fix the same by order . . . ." 15 U.S.C. § 717d(a) (1970). Sections 1(b) and 16 afforded ample authority to issue the general order requesting curtailment plans to be evaluated under section 4(b) (as the Su-

preme Court held in *Louisiana Power*) or to suspend a proposed rate change, but nowhere in section 4 is there granted the power to impose alternate rates.

The importance of the statutory section from which the Commission's action takes its legitimacy was pointed out by the Fifth Circuit in *Louisiana v. Federal Power Commission*, 503 F.2d 844 (5th Cir. 1974). In *Louisiana*, an interim curtailment plan had been issued, followed by a permanent plan with modifications. Since the interim plan had been promulgated after a section 4 hearing, the Commission was on record as having found it to be not unreasonable or discriminatory. "[W]hen FPC holds a hearing and orders a new curtailment plan, or revises an old one, it is exercising authority granted by section 5(a) of the Natural Gas Act. . . . Under that section, however, before FPC can issue a remedial order it must find that the existing curtailment plan is 'unjust, unreasonable, unduly discriminatory, or preferential.'" 503 F.2d at 861.

█ Similarly, in this case, the interim plan was promulgated as one meeting the standard of not "unjust, unreasonable, unduly discriminatory, or preferential." Accordingly, those aspects of Opinion No. 697's rate structure that amend the structure of Opinion No. 634 must be justified for reasons sufficient to uphold the *change* (and not merely the new structure) under a substantial evidence standard. Imposing this section 5 requirement, however, does

crease is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.
(52 Stat. 823) (1938).

**6.** 15 U.S.C. § 717*o* (1970) provides:
   The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with

the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified therein, rules and regulations of the Commission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours.
(52 Stat. 830) (1938).

not mean that the court cannot take cognizance of the fact that the Opinion No. 634 curtailment structure was imposed on an emergency basis, and without as full deliberation by the Commission as was possible for the permanent curtailment plan.

## II. DEFINITIONS

The FPC has chosen to apply a set of definitions to its curtailment order. Several petitioners raise the general complaint that, since the definitions were promulgated in Order No. 493–A, a proceeding which was closed *after* the hearings on Order No. 697, to apply them to Order No. 697 is not valid under the Administrative Procedure Act.

■ In the first place, the definitions stated in Orders No. 493 and 493–A were reached after a full hearing, with notice to the parties, in compliance with section 4 of the Administrative Procedure Act, 5 U.S.C. § 553 (1970). *See* "Utilization and Conservation of Natural Resources," 50 F.P.C. 831 & 1316 (1973). That these definitions would be used by the Commission in implementing end-use curtailment plans was obvious on the face of the order. And several parties to the present proceeding (including the City of Willcox, Arizona Electric Power, Southern California Edison, and General Motors) were among those whose objection to Order No. 493 led to the revised Order No. 493–A. 50 F.P.C. 1316, 1317.

A second response is that the parties who took part in the proceedings leading up to Order No. 697 were given full opportunity to comment upon the curtailment plan in all of the applications to which the Order No. 493–A definitions would refer, even if Order No. 493–A itself was not yet promulgated. The Commission was entirely within its authority to conclude that, based solely upon the evidence adduced in connection

with Order No. 697, the definitions announced in Order No. 493–A were proper and useful to the implementation of Order No. 697.[7]

As a general matter, therefore, the Order No. 493–A definitions may be used in Order No. 697. There could be challenges to specific definitions, however, which would merit this court's intervention. Three definitions are singled out in the briefs: turbine fuel, fuel for irrigation, and fuel required for ignition and flame stabilization. Turbine fuel will be considered separately in part III, *infra*, 185 U.S.App.D.C. ——, 567 F.2d p. 405.

### Fuel For Irrigation Use

■ In Opinion No. 697–A, the Commission classified irrigation as a Category 3 end-use, along with other industrial uses for natural gas. The decision at that time anticipated the possibility of subsequent change, depending upon the unavailability of alternate fuel sources for irrigation. In Opinion No. 745, issued on November 13, 1975, almost a year after Opinion No. 697–A, that possibility had developed and the Commission, after hearings, reclassified irrigation use of natural gas on the El Paso system as an "industrial process use," to be placed in Category 2. That treatment was confined in an order denying rehearing, on July 2, 1976 (RP 72–6).

Hence, the original complaint lodged by several petitioners, before Opinion No. 745, that the curtailment plan improperly placed irrigation in a low priority, has lost almost all of its force. What remains is the charge, made most clearly by Southwest Natural Gas Consumers, Pioneer Natural Gas Company, and Southern Union Gas Company in their September 17, 1976, letter and subsequent submissions, that the more favorable treatment of gas intended for

---

7. Various petitioners invoke our decision in *Pacific Gas & Electric Co. v. FPC*, 164 U.S.App. D.C. 371, 506 F.2d 33 (1974), which held the Commission's Order No. 467 to be merely a non-binding statement of policy, not applicable without more to particular curtailment orders

(and hence exempt from the requirements of the Administrative Procedure Act). For each of the two reasons just stated, however, that decision does not apply to the application of Order No. 493–A.

irrigation use was granted only as a matter of extraordinary relief, affording them no assurance of the priority they desire. That position mistakes the nature of Opinion No. 745 on two counts.

First, petitioners suggest that the language "extraordinary relief" in the opinion denying rehearing belies the notion of permanent reclassification contained in Opinion No. 745. But that verbiage was only concerned with the procedural route leading to the order in RP72–6; it in no way makes the substantive result in Opinion No. 745 any less permanent. Opinion No. 745 was reached in a quasi-extraordinary relief proceeding which incorporated elements of a general reclassification procedure as well as a hearing on extraordinary relief. The decisions on several issues in that opinion emphasize its reasonably permanent nature. For example, on page 2 of the order denying rehearing, the Commission explicitly rejects a proposal that irrigation uses be reclassified into a lower priority as soon as alternative fuel sources became available. The reasons given by the Commission for not adopting a short-term Category 2 classification, and also for rejecting General Motors' proposal for irrigation classification according to the cost of conversion, were not expressions of short-term convenience, but grave doubts as to the Commission's own ability to administer such systems over the *long run*.

The second line of argument that Opinion No. 745 should not moot petitioners' claims regarding irrigation relies on the Commission's brief in Docket No. RP75–62, involving curtailment on the Cities Service Gas Company line. In that proceeding, the FPC presently indicates it will advocate an industrial classification for irrigation fuel. Passing over the problems of relying on an initial brief of an agency as a conclusive statement of agency policy, there is ample reason not to credit the FPC's position in *Cities Service* as relevant to El Paso. As the initial brief in *Cities Service* clearly explains, the industrial classification of irrigation fuel on that system was due to factors peculiar to that system, including the historical practices of Cities Service and the extent of likely curtailment. The Commission's order in El Paso will remain in effect unless and until need for further hearings arises, at which proceeding petitioners may be heard. That status is as permanent as any aspect of the curtailment plan, and petitioners' complaints regarding irrigation fuel must be dismissed as moot.

### Ignition and Flame Stabilization

It is argued that petitioners' complaints concerning ignition and flame stabilization utilization of natural gas have over this same period become less ripe. In Opinion No. 634, the Commission defined Priority Category 2 as including "Large commercial requirements and industrial requirements for plant protection, feedstock and process needs." Pursuant to that definition, El Paso submitted a proposed tariff sheet defining the term "process gas" as "gas required as a fuel for which there is no feasible alternative. This term includes gas required for ignition fuel and flame stabilization in the generation of electric energy." (J.A. 353, Tr. 13776). That definition was applied for purposes of the interim plan.

The Commission, meanwhile, was preparing its general definition orders, Order No. 493 and Order No. 493–A. Process gas was defined in the October 29, 1973, order as "gas use for which alternate fuels are not technically feasible such as in applications requiring precise temperature controls and precise flame characteristics." "Utilization and Conservation of Natural Resources," 50 F.P.C. 1316, 1320 (1973). At the time of promulgating Opinion No. 697, the Commission looked to this Order No. 493 definition and found that it adequately expressed the characteristics of those ignition and flame stabilization uses intended for special priority under Opinion No. 634. Hence, it was no longer necessary for the definition of process gas to include explicitly ignition and flame stabilization.

When El Paso filed its tariff sheets on March 27, 1975, and April 11, 1975, in sup-

posed compliance with Opinion Nos. 697 and 697A, the priority of ignition and flame stabilization fuel had been made explicit—but it was Priority Category 3 rather than 2. This decision was based upon El Paso's judgment of the ability of its users to substitute for natural gas in these functions. A storm of protest followed, much of which is reflected in petitioners' complaints to this court.

However, we do not presently reach whether El Paso's factual determination was adequate, or whether the Commission's explanation for the change in its language between the interim and permanent curtailment plans is satisfactory. On December 24, 1975, the Commission issued an order in Docket No. RP72–6 stating that "it is necessary to hold a limited hearing in this proceeding . . . to consider whether some or all alleged flame stabilization and ignition requirements are Priority 2 uses as the customers insist or are properly classified in El Paso's proposed tariff sheets." The Commission ordered that "a public hearing shall be held as soon as practical" on this matter. (RP 72–6 at 15).

■ The possible availability of findings of fact relevant to the ignition-flame stabilization-process gas question argues for waiting. There has been no indication to this court of action on the proposed hearing since it was announced in December of 1975, however; and it is open to any of the petitioners here to seek again our immediate review should the hearing have been unwarrantedly postponed.

■ The present status of the curtailment order requires some intermediate relief, however. Opinion No. 634 provided Priority 2 classification for ignition and flame stabilization use of natural gas. The explicit reason offered by the Commission in Opinion No. 697 for removing the reference to ignition and flame stabilization was only that it was superfluous; not that those uses were actually more able to substitute

alternate fuel than had originally been thought. Hence, El Paso's lowering of the priority for *all* natural gas devoted to these uses can only be seen as a substantial change in what was intended by the interim and permanent curtailment orders. The hearing proposed by the Commission will determine whether there is adequate evidence justifying this change; but in the meantime, the only curtailment priority approved by the FPC and sustainable by substantial evidence was the one established by the interim order, which, according to the FPC, was intended to be carried over into the permanent plan. Until the Commission determines, after a hearing, that there is substantial evidence proving that all flame stabilization and ignition uses for natural gas can, with "technical feasibility," be replaced by alternate fuels (as all those terms have been defined by the Commission), Priority 2 classification must be accorded to flame stabilization and ignition.

### III. BOILERS

■ In *ASARCO, supra,* we reversed the subordination of boiler fuel uses to other end-uses provided in the interim plan because of the FPC's failure to articulate the reasons for such treatment. In Opinion No. 697, the Commission attempts to remedy this omission by listing three reasons supporting the lower priority for boiler fuel use: (1) alternate fuels could be more easily substituted for natural gas in boiler fuel applications than in other applications; (2) the "increase in air pollution resulting from the use of alternate fuels could be more efficiently and economically controlled" on boiler installations because of their larger size; and (3) economic disruption would be minimized by curtailing single large users such as boilers. (J.A. 431, Tr. 16,604–05). The second and third of these are persuasive.

■ Because the FPC is sustained on other grounds, the inadequacy of its first ex-

planation will be considered only in footnote.[8]

In the Commission's second explanation, the larger size of boiler installations, as compared with other natural gas users, is suggested as a reason for the more economical control of air pollution, which would result from the use of alternate fuels, by boilers rather than by other operations. There is sufficient record evidence for this conclusion. Among other testimony the Commission refers to the witness Markus on this point. (J.A. 99–102, Tr. 7050–7053). He draws a distinction between boilers at electric generating stations and boilers at industrial plants, with the former being both more efficient and more able to substitute alternative fuels. The basic difference is size; electric generating boilers are of a larger magnitude, and the witness notes that a "large pollution control installation can control pollution at a lower cost per unit of fuel consumed than can a small installation." Most important, the witness gave testimony that the benefits to both kinds of boiler uses "reflect efficiencies of scale not feasible for the operator of a typical industrial boiler." (J.A. 100, Tr. 7062). This testimony provides the Commission with an adequate defense for its pollution control argument.

In this connection, we recognize that the Arkansas-Louisiana and United Gas curtail-

---

8. In its brief, the Commission points to three instances in the record to defend its first reason. None of these sustain the proposition that, as opposed to other industrial uses, boilers were more able to use alternative fuels. The evidence all related to different issues.

The first reference is to testimony by the witness Truax that it would take time before substitutes could be developed for industrial uses requiring natural gas as a *process* fuel. At its strongest, the testimony would only support a conclusion that boilers, as one example of non-process fuel users of natural gas, *could* more easily find substitutes for natural gas than could users of natural gas as a process fuel. (J.A. 67, Tr. 1837). This says nothing about boilers within the class of non-process (industrial) fuel users.

The second record citation is to testimony by the witness Helmut Frank. · On the general issue of alternatives to natural gas, the witness testified that "except for under-boiler use, as in steam-generated electric plants residual fuel oil is not a practicable alternative for current gas users." (J.A. 91, Tr. 4363). Once again, that single statement cannot support the inference that *all* boiler fuel usage is more able to shift to residual fuel than all other industrial uses for natural gas.

The last record evidence relied upon returns to the process-industrial fuel distinction. The witness Markus commented on the alternative fuel availability for process use of natural gas, and concluded that the capital costs of re-tooling those plants using natural gas as a process fuel to permit them to accept other fuels would be quite high. (J.A. 97–99, Tr. 7048–7050).

Entirely lacking in all of the record evidence cited is a simple statement by a single expert that alternative types of fuel could more easily substitute for boiler fuel usage of natural gas than for any other industrial use of natural gas.

Had Order No. 697 subordinated all industrial use to all process use, that would have been upheld by the record citations; but the disadvantageous treatment of boiler fuel vis-a-vis other industrial uses has not been sustained.

When Opinion Nos. 643 and 643A, involving curtailment on the Arkansas Louisiana Gas Company system, were considered by this court, and when Opinion Nos. 647 and 647A, involving curtailment by United Gas Pipe Line Company, were ruled on by the Fifth Circuit, *Louisiana v. Federal Power Commission,* 503 F.2d 844 (5th Cir. 1974), the subordination of natural gas in boiler fuel uses was sustained. *Arkansas Power & Light Co. v. FPC,* 170 U.S. App.D.C. 393, 398, 517 F.2d 1223, 1228 (1975), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1146, 47 L.Ed.2d 341 (1976); *Louisiana, supra,* 503 F.2d at 860. It would be tempting to accept this preference as a settled matter on the basis of these other decisions. However, the nature of the issue prevents this. As the Federal Power Commission itself has realized, "there is no superior or inferior use of natural gas *per se*; it depends upon the circumstances." *Chandeleur Pipe Line Co.,* 45 F.P.C. 370, 371 (1971). The fact has been amply justified by the several pieces of record evidence that have been brought to light: fuel use is quite different in electricity generation, in turbines, in under-boiler applications, and in other boiler usages. The purpose of our reversing and remanding the boiler fuel provision in *ASARCO* was to obtain the type of information, particular to the usages on the El Paso system, that would sustain the logic of a "boiler-fuel vs. all-other-use" distinction. The evidence to which the Commission now points is of no more avail in this regard than the invocation of "established Commission policy" that was found insufficient in *ASARCO.* 161 U.S.App.D.C. at 26, 494 F.2d, at 945.

ment plans' boiler subordination mentioned above (*see* footnote 8) were not sustained on the pollution-control argument. The fault in each instance, however, was not a failure of logic but an absence of record support. At least for the El Paso system, that fault has now been corrected.

The last justification offered is closely patterned to the previous one. Since boilers are the largest users of natural gas, on a per plant basis, more natural gas can be curtailed with fewer plants affected if boilers are the first curtailed. The record portions cited by the FPC's brief are inapposite, but there is sufficient evidence already alluded to in the discussion of the second rationale to uphold this explanation. We note that the phrasing of this advantage has changed from that suggested by the Commission in the Arkansas-Louisiana and United Gas curtailment plans, *supra*. In those cases, the premise was that boilers could more easily substitute alternate sources of fuel, and for that reason the economic disruption from curtailment would be minimized by cutting back boilers first. The Commission no longer relies on that premise for the justification based on minimization of economic dislocation.

■ Opinion No. 697's inclusion of natural gas used by electricity-generating turbines within the boiler fuel category raises a separate problem. The interim curtailment order, Opinion No. 634, excluded "gas-powered turbines utilized for electric generation" from the definition of boiler fuel use (J.A. 341, Tr. 13,748), but this decision was reversed in Opinion No. 697. The stated reason for this change was that "[a]s a practical matter, we cannot control the use of natural gas in electric generating boilers without including volumes available for use in gas turbines within the definition of boiler fuel use." (J.A. 506, Tr. 17,102). Tur-

bine use has been found to be less efficient than boiler utilization for the generation of electricity. That finding is sustained on record evidence. *See, e. g.*, J.A. 100, Tr. 7051. But the Commission went on from that fact to infer that natural gas allocated to turbine use would be diverted to electricity generation through boilers whenever possible. That step of inference is totally without support in any piece of evidence of actual diversion. On this record, it is entirely surmise. No doubt the Commission is entitled to a great deal of latitude in predicting how its orders will be applied by the industry. The Commission places its entire argument concerning this question on that proposition.[9] But Opinion No. 697 is not a new order, written as the Commission's first venture into curtailment. It follows upon an interim order, and changes in that interim order must be justified. (*See* Part I, *supra*). In the absence of the slightest reference of abuse during the period of the interim order, there is nothing to sustain the Commission's change of mind on turbine fuel usage. Even if the provisions of section 4(b) of the Natural Gas Act, rather than the specific-finding of discrimination provision of section 5(a), were held to govern the promulgation of Opinion No. 697, there is lacking here any evidence of "undue preference or discrimination."

The Commission also counters with the argument that, since the turbine-fuel objection is principally raised by Arizona Electric Power Company (AEPCO), it could seek a special reclassification. (Brief for Respondent at 58). That is an attractive suggestion, but courts must be careful not to close out legitimate claims on the hopes that they will be otherwise redressed. Perhaps Arizona Electric could obtain a reclassification, but to proceed by individual variance is to admit that the overall concept is valid. Ar-

---

9. The dissent would uphold the lower classification of natural gas devoted to turbines on the basis that such a use is less efficient than boiler use. That factor alone would not justify lower priority since turbines might also use alternate fuels less efficiently, or with more detrimental

impact on the environment, than boilers. However that question may be resolved, the only basis upon which the Commission's order relied was the possibility of substitution (J.A. 506; Tr. 17,102), and that basis cannot be sustained.

izona Electric does not allege particular facts whereby its situation should be distinguished from such a generally valid order, it attacks the fundamental basis for the order; Before commending Arizona Electric to the particular relief suggested by the Federal Power Commission, we would have to be convinced that the general plan was, indeed, sustainable. And that case has not been supported by substantial evidence.

## IV. THE BASE PERIOD

The curtailment plan envisions a maximum limit on the amount of natural gas going to each of El Paso's customers. These "base volumes" become applicable whenever El Paso's supply of natural gas falls short of the current demand. They prescribe the total amounts of natural gas by priority classification available for the various users.

Three problems have arisen from the time periods in the past which were used in establishing the base volumes. Opinion No. 634, issued on October 31, 1972, established the twelve month period immediately preceding that date as the appropriate measuring time. The first objection raised to that procedure was that, by measuring actual historical use of El Paso gas over that twelve month period, the plan paid no attention to the then-developing shortage of non-El Paso natural gas. That shortage was allegedly critical to the California customers who, as explained before, did not rely exclusively on El Paso. The two California users maintained that setting the El Paso gas supplied during the last twelve months as the maximum volumetric entitlement in time of curtailment unfairly assumed that all users were otherwise identically situated. Because of the developing scarcity of non-El Paso natural gas, it was likely that the California users would have to increase their reliance on El Paso natural gas in the near future; but that contingen-

cy had not been envisioned in the El Paso curtailment plan.

When this complaint was before this court in the context of the interim plan, we decided that, because of the emergency, short-term nature of Opinion Nos. 634 and 634–A, it was not fatal to ignore the developing "pre-existing curtailment" of non-El Paso sources felt by the California customers. *ASARCO,* 161 U.S.App.D.C. at 23, 494 F.2d at 942. Our decision there was explicitly premised on an expectation that the Commission would consider the local California natural gas shortage in promulgating a final, permanent plan, and would "enunciate findings with respect to that situation" as well. Now that the permanent plan has come before us, we again consider whether the Commission's decision to ignore the pre-existing shortage of local gas in California was unduly discriminatory to the California users.

Two related issues have also become involved in our review of the time period established for calculating base volumes. First, no explicit prohibition against adding new users to the various distributors' systems within the general El Paso system was contained in the interim curtailment order. Several of the EOC distributors, subsequent to the date of Opinion No. 634, did add new customers, including customers in the top priority levels.[10] Opinion No. 697A took account of this by establishing a moratorium on adding new customers, for purposes of receiving curtailment allotments of natural gas. As for those new users added during the twenty-five and one half month interval between the interim and final plan, Opinion No. 697A provided that the base period for volumetric calculation would be "actual historical takes for the 12 month period ending October 31, 1972, adjusted to also reflect the annualized effect of attached Priority 1 and 2 loads existing as of October 31, 1974." (J.A. 489, Tr. 17,085). In addition, penalties were imposed for all

---

**10.** Tucson Gas & Electric Company added 3,000 residential and commercial users during the October 31–December 19, 1974 period.

(Brief of Tucson as Intervenor at 18). (The term "EOC" means "East of California.")

natural gas withdrawn in excess of the volumetric limits, except where necessary to protect a Priority I or II use. The date of Opinion No. 697A was December 19, 1974.

Tucson Gas & Electric and Arizona Public Service Company ("APS") raise the objection that the gap between October 31, 1974, and December 19, 1974, places them in a predicament. These companies during this period were adding high priority users in reliance on the interim order's absence of any limitation on attachments, only to be told later that those users could not be included in the curtailment allocation. The argument is carried even further that, since these utility companies are required under state law to receive permission before they can refuse a requested extension of service to a user in what has come to be a high priority classification, it was unreasonable to impose a moratorium on attachments even as of the date of the issuance of Order No. 697A. Instead, it is contended, the curtailment plan should have taken cognizance of all new attachments until such time as Tucson and APS could receive authority from the State of Arizona to refuse such new requests for service.

The last problem arising out of the base period determination stems from the meteorology of the period: the winter of 1973 and pre-November 1974 were unusually warm. Hence, the Arizona users allege, their reliance on El Paso natural gas was abnormally low and a more expectable average of natural-gas use should have been employed.

The second of these three problems is most usefully discussed first. It is arguable how justified was the reliance of those natural gas distributors who added customers subsequent to the interim curtailment order. There was never any doubt that the conditions of the eventual curtailment plan would require some calculation of a maximum amount of natural gas, and that for each distributor, such a calculation would necessitate a ceiling on the number of customers to be served. On a fuller record, it

might be concluded that those exceptions should be afforded only to those distributors who, having sought refusal powers from their state regulatory bodies immediately upon the issuance of the interim plan, were nevertheless denied. However that may be, the Commission has stated quite a different position, which bears upon all three problems here addressed. In Opinion No. 697A, the FPC stated, "we recognize . . . that growth in the higher priorities would be in fact have occurred in the normal course of load upgrading, since no express prohibition was contained in the interim plan and in view of our decision not to impose overrun penalties for the interim plan. . . . [W]e find that the only reasonable alternative is to require El Paso to adjust the Opinion No. 697 base period to reflect that growth." (J.A. 488, Tr. 17084).

The Commission's own judgment is that it is entirely appropriate for the natural gas distributors to have added customers up until the time they were explicitly told not to do so. The logic of that position extending their entitlement must be consistently applied. Accordingly, it was arbitrary for the Commission to refuse to order the inclusion of those users added up until the date that Opinion No. 697A was actually promulgated, and the explicit prohibition on attachment of further high priority users was declared. However, because the December 19, 1974, order by the Federal Power Commission was preemptive it was reasonable to exclude from the base used for the curtailment plans those users added after that date, even if that was before the time distributors obtained state permission to exclude them. The FPC argues that APS and Tucson were dilatory in requesting authority to refuse new, high priority users on their respective systems. If that were so, that would be an additional ground for excluding post-December 19, 1974, customers. Both APS and Tucson delayed until late February. Whether the additional two-month interval was excusable and reasonable or whether APS and Tucson should be held to be bound from the

date they received notice of the Commission order providing for the exclusion from the base period of new customers added thereafter we leave to be settled at a hearing before the Commission on remand. Nothing prevents the FPC as a matter of discretion from granting special relief to suppliers in this predicament, but that is not required.

■ The Commission's decision in Opinion No. 697A to depart from the six-month time period ending on October 31, 1972, was motivated by a desire to accommodate certain EOC customers of El Paso, who otherwise would have had more actual demand on their system for natural gas than had been recognized in the curtailment plan. That disposition must be applied equally to the California customers as well. Their position also involves more demand on their system for natural gas (because of a scarcity of non-El Paso gas) than had been recognized in the curtailment plan. To alter the curtailment plan for EOC customers might not have been necessary; but, having done so, the FPC assumed an equivalent obligation for the California customers as well.

The Commission relies on four pages of Opinion No. 697, and two attached exhibits, to satisfy our mandate in *ASARCO* to "consider the pre-existing shortages in California and to enunciate findings with respect to that situation". *ASARCO, supra*, 161 U.S.App.D.C. at 23, 494 F.2d at 942. The evidence recited in those pages of the opinion (J.A. 434–39, Tr. 16608–16611) refer to the non-El Paso sources of natural gas for the California customers. The Commission admitted that "deliveries to interruptible customers [by non-El Paso sources] have been declining since 1970," and concluded that "this decline in service can be attributed to two factors only. One, that the California source supplies are declining, which is a fact of record, and (2) that the gross industrial market for natural gas in Southern California has been growing, which is also a fact of record. (Ex. 105). Solutions to both of these causal factors are clearly outside the scope of the Commis-

sion's jurisdiction." (J.A. 436; Tr. 16609–16610).

These references do establish that the Commission paid attention to the shortage of natural gas in California, but they fall far short of providing a basis for justifying the FPC's failure to provide some relief to the California users because of that shortage. To say that scarcity is due to high demand and low supply is simply to state a tautology of economics. It is well within "the scope of the Commission's jurisdiction" to consider the need for natural gas in the area even though the need has become more critical because of a developing scarcity of local gas, and to increase the supply by a more lenient curtailment plan that did not treat as equivalents two sets of customers in vastly different situations regarding their supply of natural gas. It was precisely the factor of growing demand (between the time of the interim and final curtailment orders) that the Commission found to be fully expectable and deserving of consideration for the Arizona customers. California customers are entitled to have their needs similarly considered.

The Commission parries by stating that, even if true that the California users will have more occasion to rely on El Paso, as their alternate fuel sources dry up:

One significant and highly variable factor controls the ability of industrial consumers exposed to natural gas curtailment to continue their operations, to wit, their ability to use and secure alternate fuels. There is no evidence in this record that industrial consumers in California are in a worse position with respect to their ability to use or to secure alternate fuels than consumers located in E–O–C. (J.A. 437, Tr. 16610)

■ The simple refutation is that California consumers will be forced more often to resort to alternate fuels because of their heightened scarcity of natural gas. That disparate scarcity, if such be the fact, between California and EOC users, raises a *prima facie* inference that FPC treatment

of both classes of consumers identically, in terms of historical reliance on El Paso, is discriminatory in the most important sense of the Act, the need for natural gas. The Commission would have to establish that California consumers were singularly *more* able to employ alternate fuels than EOC consumers before it could rebut that *prima facie* case. The Commission has not done so.

The Commission is required to give more consideration to the peculiar shortages in California in order to comply with our *AS-ARCO* opinion, and, also, as a matter of affording equal treatment to California and EOC customers. This does not mean that El Paso must supply the *full* amount of the shortfall experienced in California because of local conditions. Other factors such as the difference in priorities of use, and a proven greater ability to use alternate fuels, might, in the end, support a decision requiring less than full contribution. But the precise result cannot be foreseen, cannot be dispensed with by the conclusory statement offered by the Commission on this record, and must be made the subject of explicit findings following a full hearing.[11]

■ The final objection raised concerning the base volumetric curtailment period does not necessitate intervention by this Court, but may be amended by the Commission in its reconsideration of the matters that are to be remanded. It was not mandatory for the Commission to consider whether the periods of measurement used in establishing the base volumes covered an unusually warm period in Arizona. If the Arizona distributors claim they have a right to additional volumetric entitlement because the base period covered an unusually warm winter they are free to petition the FPC for a variance, but they will be required to show that the weather in their area operated to *discriminate* against them relative to consumers in other areas on the pipeline. If the effect of the weather during the base period was reasonably uniform throughout the entire system all distributors would be affected in the same way and none would be entitled to special consideration.

■ In sum, a remand to the FPC is necessary regarding the base used for volumetric entitlements and the claims of the Arizona distributors. Volumetric entitlements to El Paso customers must reflect consideration of *total* natural gas needs and the possibility of satisfying said needs, at least to some extent, from El Paso gas, rather than rigidly reapportioning entitlements solely on the basis of historical use of El Paso gas. This is what is required by the Natural Gas Act's prohibition against discrimination, 15 U.S.C. §§ 717c, d (1970). It may be that the Commission in its judgment will decide that the increasing California shortages cannot, in fairness to other users of higher priority on the system, be met by additional entitlements of El Paso gas, or can only partially be met from that source, but this does not mean that the Commission can avoid its statutory obligation by a conclusory finding that it lacked jurisdiction. It has jurisdiction, even though the volume of available El Paso gas, the higher priorities of other distributors, and the ability to use alternate fuels may seriously restrict the ability or need for the

11. The dissent reads too severely what is required by our remand of this point. We do not hold that the Commission policy of equal curtailment of full and partial requirements customers, or pipeline-by-pipeline regulation, be "subverted" in any way. The problem we see, rather, is with the base period, during which the California customers' reliance on El Paso was alleged to be less than it has now become. The Commission's own order recognizes that alternate supplies to California users have dropped since "the time the record was compiled in this proceeding" (J.A. 436, fn. 8; Tr. 16,609, fn. 8). Whatever policy the Commission wishes to follow, it must be based on an appreciation of present needs of the several areas relying on the El Paso system, rather than on historical records of use measured in September of 1972 (J.A. 417; Tr. 16,592); particularly given the Commission's recognition (*supra*) that California customers' reliance on El Paso was at that time in a state of flux relative to EOC users.

Commission to exercise its jurisdiction to increase California entitlements.

The Commission must also turn its attention on remand to the post-Opinion No. 634 additional users on the Arizona systems. Unless the FPC holds new hearings and sustains a change in its position on including those users in the volumetric entitlement calculations, it must extend consideration to all new users added up to the time of Opinion No. 697A's promulgation, December 19, 1974, not just to October 31, 1974.

No change is presently mandated concerning weather conditions over the base period.

## V. FUEL STORAGE

The injection of natural gas into storage tanks by PG&E and SoCal, the two California customers of El Paso, creates a difficulty in the curtailment categories that was first addressed in our *ASARCO* opinion. The interim plan on review there, Opinion No. 634, treated natural gas retained in storage as outside the scheme of any end-use deserving priority classification. Conversely, when such natural gas was withdrawn from storage, it was treated as though it had been supplied from an independent source.

The interim plan had allocated natural gas between the California and EOC users in accordance with the percentage reliance of each user upon the El Paso system. All the EOC users relied exclusively on El Paso, but the California users had alternate sources for natural gas, with the result that they received about 80% of their total supplies from El Paso. The central concept of the curtailment plan is to accord as much natural gas as possible within each priority category, up to a user's total needs, and then to progress to the next highest priority level. But in determining what a user's total needs were, the California customers were evaluated at their needs *from El Paso* or about 80% of their actual total needs.

With a fixed amount of natural gas supplied by El Paso, the California users made up the difference at peak times from other sources, and at slack times, injected the El Paso-supplied surplus into storage tanks. The EOC customers, in contrast, stored no El Paso fuel but altered their daily purchases depending upon conditions.

By treating the natural gas taken from the California users' storage tanks as coming from an independent supply, Opinion No. 634 reduced the estimate of those users' reliance on El Paso. It seemed as though more natural gas was coming from non-El Paso sources than was actually the case. Accordingly, the allocations to the California customers of curtailed gas were lower than they should have been. It was this unfairness that prompted the remand of the issue in *ASARCO*.

The response of Opinion No. 697 was to treat storage-injection as an end-use in itself, and afford it Priority 2 classification. The Commission's reasoning was "Natural gas used for injection into storage should also be accorded a relatively high priority as the primary purpose of storage is the protection of service to residential and other temperature-sensitive consumers during the winter heating season." (Tr. at 16,602; J.A. at 428). That statement incorporates two separately distinguishable conclusions concerning origin, and then priority, of storage gas.

Since Opinion No. 697, like Opinion No. 634, views withdrawals from storage as an independent source of fuel supply, our mandate in *ASARCO* is sought to be complied with by recognizing the El Paso-origin of storage fuel as it enters storage, rather than when it is taken out from storage. That is an acceptable way of guaranteeing that the California users are not viewed as less dependent upon El Paso natural gas than they actually are. The second step is to decide in which of the five priorities the natural gas allocated to storage should be placed. If the storage gas were measured as it was used, this would present no problem, for then it would simply be added to the other volumes of gas being utilized for

each of the priority classifications. But the Commission's decision to consider storage fuel as it enters storage presents it with a difficulty from which it is not fully extricated by Opinion No. 697A.

In Opinion No. 697, all storage gas was accorded Priority 2 classification. This solved the problem of underestimating California users' reliance on El Paso. However, it accorded a high priority to substantial quantities of natural gas that might not eventually be consumed in a high priority end-use. The FPC's language in Opinion No. 697, quoted above, was weak on its face: because the *primary* purpose of storage gas was Priority 1 or 2 uses, the *exclusive* priority classification for such gas would be Priority 2.

■ The Commission's proposed correction, in Opinion No. 697A, was to afford Priority 2 classification only to that percentage of a customer's storage gas equal to the percentage of natural gas actually devoted to a non-storage Priority 1 or 2 end-use by the particular customer. This meant that all other storage gas was treated as not coming from the El Paso system, either at the time of injection or at the time of eventual utilization. To that extent, the Commission has failed to comply with our *ASARCO* decision, where, with reference to a proposal by the FPC staff rejected by the Commission, it was stated:

> There is no suggestion that the proposed storage adjustment formula would impede implementation of the interim plan. The mere fact that the solution is compli-

cated cannot justify the Commission in refusing to provide just and reasonable interim curtailment procedures. We therefore remand this matter to the Commission for further consideration of the proposed storage adjustment formula. *ASARCO, supra,* 161 U.S.App.D.C. at 24, 494 F.2d at 943.[12]

Hence, the Commission failed to accomplish what it set out to do in Opinion No. 697A regarding the storage fuel priority classification. Rather than relying on its former assumption that storage fuel was primarily intended for residential and other high priority uses, the Commission offered the solution described above. But the premise of that solution, that natural gas taken from storage will be distributed across all end-uses and priority classifications, is not correct. Storage gas is relied upon primarily for low-priority end-uses. When the need for storage use arises, it must be that the other sources of natural gas have not been able to supply all current demand. But the higher priority uses would have been met first. Hence, the function of storage gas must be to supply the lower tier of priorities in the order of their preference. Admittedly, there could be occasions where the shortage was so severe, that in order to supply even the top priority category, resort to storage would be necessary. But as a general rule, at least for the immediate present, the percentage of *storage gas* that is used for higher priority end-uses will be less than the percentage of *all gas* that is used for higher priority end-uses.

12. Opinion No. 697A did correct one weakness in Opinion No. 697. Opinion No. 697 had recognized only *net* storage fuel injections over the course of the year as being supplied by El Paso. (Net storage fuel injection represented the excess fuel injection into storage over fuel withdrawn from storage for consumption). Opinion No. 697A realized that, over a year, that measure would not be reflective of the *gross* volume of El Paso gas that was injected into storage. Opinion No. 697A adopted a scheme that would approximately measure the gross amount of El Paso gas being put into storage. A direct measure of that amount was not attempted. Instead, the Commission took account of the fact that most storage gas is injected in the summer, and withdrawn for use in the winter (although some withdrawals do occur in the summer, and there are sometimes injections in the winter). Hence, injections minus withdrawals in the summer months (*i.e.,* net summer injections) are a rough approximation of gross total injections over the year (J.A. 496–97; Tr. 17092–93). While a more precise estimate would be desirable, the FPC's choice of method in Opinion No. 697A is not so arbitrary as to compel reversal—particularly because an issue purely of measurement technique is involved.

A remand to the Commission on the issue of storage is therefore necessary. In revising its permanent curtailment plan for the El Paso system, the Commission must guarantee: 1) That all use of El Paso-originating natural gas (whether detained in storage for a period of time or not) be recognized in setting the percentage reliance of California customers upon El Paso. 2) That double counting be avoided either by considering the El Paso origin of the natural gas as it is injected into storage, or as it is withdrawn from storage, but not both. 3) That the priority accorded to natural gas kept in storage be in proportion to the eventual end-uses of that gas, unless the Commission wishes to support with an evidentiary hearing the importance of storage gas irrespective of the end-use to which it is eventually put. This last position was strongly hinted at in the Commission's brief, but formed no part of the storage-priority decision by the Commission itself, and hence cannot be accepted as an explanation before this court. *Securities and Exchange Commission v. Chenery Corporation*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

## VI. ENVIRONMENTAL IMPACT STATEMENT

A problem is raised by the intervenor Salt River Project Agricultural Improvement and Power District concerning the compliance of Order No. 697 with the National Environmental Policy Act of 1969. Under that Act, all federal agencies are required, "to the fullest extent possible," to

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . the environmental impact of the proposed action
>
> . . . .

42 U.S.C. § 4332 (1970). The proposed permanent curtailment plan has been issued without any environmental impact statement. Although the Commission at one time maintained that curtailment plans were, because of their contingent nature, exempt from the requirement of filing an environmental impact statement, it now recognizes that the court's *ASARCO* opinion, and that of the Fifth Circuit in *Louisiana v. FPC*, 503 F.2d 844 (5th Cir. 1974), have ruled unacceptable that manner of procedure. Accordingly, in Opinion No. 697A, the Commission reluctantly concludes:

> We are therefore constrained to remand this proceeding for the limited purpose of preparation and circulation of an environmental impact statement in accordance with Section 102(2)(c) of NEPA. This step is taken in spite of our belief that the impact statement so developed will add little of substance to the environmental record already developed in this proceeding.

This left the question of what force the Commission wished to attach to Opinion No. 697 before the environmental impact statement issues. Finding that immediate implementation of the plan was necessary, the Commission decided that Order No. 697 (and 697A) "should therefore be considered as a revised interim plan until such time as the Commission rules on its appropriateness as a permanent plan for the El Paso system." (J.A. 509–510; Tr. 17105–17106). The Administrative Law Judge to whom the opinion was remanded was given authority "to modify the plan as may be required by the environmental evidence" adduced at this hearing (*Id.*)

The fact that this plan is officially an interim one does not oust the jurisdiction of this court. *See ASARCO, supra; Louisiana, supra.* They are nonetheless final FPC actions. And if the changes made on the basis of the environmental hearings are as minor as the FPC expects, any review of the permanent curtailment plan can be considerably abbreviated by reason of the opinion in this case (except, of course, for challenges to the adequacy of the environmental impact statement).

It is Salt River's contention, however, that the issuance of Opinion No. 697 should be held up, even as an interim plan, until the environmental impact statement is provided. The effect would be the continued applicability of the original interim plan, a matter of no small monetary consequence even if the environmental statement were furnished within a few months. A related question is whether it is consistent with NEPA to treat an environmental impact statement in the begrudging manner that admittedly characterizes the FPC's action in this case. More specifically, is there an obligation to consider environmental consequences as a major federal action is being planned, or is it sufficient to proceed with the development of the program, announce it, and only then turn to a consideration of the environmental consequences?

■ The second question can be disposed of as not yet ripe for adjudication. The adequacy of the environmental impact statement can only be judged once that document has actually been produced. The Commission's remand to the administrative law judge affords him a wide baliwick for his authority to consider environmental effects, and this court cannot say that no amount of post-hoc consideration, study, and alteration of the curtailment plan could ever satisfy NEPA's requirements. However, it is well to repeat the warning this court issued in *ASARCO*, that "our ruling today is not a license for permanent or prolonged evasion of responsibilities under NEPA." *ASARCO, supra*, 161 U.S.App. D.C. at 30, n.47, 494 F.2d at 949, n.47. In *Scientists' Institute for Public Information, Inc. v. AEC*, 156 U.S.App.D.C. 395, 408, 481 F.2d 1079, 1092 (1975) we stressed that the purpose of an environmental impact state-

ment is to provide information "*before* the action is taken" so that alternatives can be considered (emphasis added). *Cf. Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Similarly, in *Louisiana*, the Fifth Circuit, while recognizing that speculation was unavoidable, interpreted NEPA as requiring that the "FPC, *in formulating that plan*, take into consideration as best it can the plan's probable effect on the environment." *Louisiana* at 876 (emphasis added). Those two curtailment plan decisions recognized that the environmental impact statement, to be useful in the way intended by the statute, must be issued as part of the formulative process of the plan, rather than serve merely as a post-hoc catalogue of the environmental results of a complex plan developed without reference to those impacts. Reliance on an interim curtailment plan, and particularly one which the FPC states will in all likelihood become the permanent plan, could well develop. Once it does, the tardy issuance of an environmental impact statement would unduly influence the balance of considerations against change, even when necessary to avoid serious environmental consequences. *Calvert Cliffs' Coordinating Committee Inc. v. United States Atomic Energy Commission*, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). To all this we add a qualifying note. Any reasonable person will recognize that a meaningful and final EIS cannot be prepared on *all* aspects of any plan until the full details of that plan are known. However, the mandate of the statute requires environmental consequences to be considered throughout the formulation of the plans to the fullest extent possible. Some situations call for an interim EIS. The requirements of NEPA to any situation can be resolved by a common sense application of these principles.[13]

**13.** 42 U.S.C. § 4332 (Supp. V, 1975) provides:
The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;
(B) identify and develop methods and procedures, in consultation with the Council on Envi-

Hence, while we refrain from staying the applicability of the interim plan until the environmental impact statement has issued, we do caution that this forbearance is premised on the expectation that the Commission will develop a complete environmental record, considering all relevant alternatives as fully as though no interim curtailment plan had intervened. Expectancy interests can be kept at a minimum by the understanding that since the Administrative Law Judge under the statute will

have this broad authority to revise the plan, reliance on the interim plan will not necessarily control his decision.

The issue still remains, however, of whether it was permissible to by-pass an environmental impact statement even construing Order No. 697 as an interim plan. The language of the National Environmental Policy Act in its terms would require such a statement even for an interim curtailment order. But the Natural Gas Act

ronmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council of Environmental Quality established by subchapter II of this chapter. (89 Stat. 424)

requires the Commission "to take effective interim curtailment action in the exigencies presented by gas shortages", *Atlantic Gas Light Company v. FPC*, 476 F.2d 142, 150 (5th Cir. 1973), and this obligation has been held, in other circumstances, to override the NEPA filing requirement.

*Calvert Cliffs*' announced that only such a "statutory conflict" could constitute an impossibility sufficient to overcome NEPA's requirement of compliance "to the fullest extent possible." [14] In *ASARCO*, the impending 1972–1973 heating season created the need for an immediate curtailment plan, without the delay involved in the preparation of an environmental impact statement. *ASARCO, supra*, at 948. In *Atlantic Gas, supra*, the court was less specific as to immediacy, finding that "A detailed evaluation of the environmental impact of a curtailment order would entail precisely the sort of delay which the Supreme Court noted and disapproved in the course of a decision which held that the Natural Gas Act authorizes the Commission to follow summary procedures in exercising its curtailment power. *Louisiana Power & Light Co. v. Federal Power Commission.*" 476 F.2d at 150. Salt River asserts that no case for immediate need has been made out in the present setting. The Commission responds that there is ample evidence sustaining the changes made in Order No. 697, and that it would be contrary to its obligation to the public to postpone implementing a preferable curtailment plan. No attempt to argue exigent circumstances is made by the Commission. If we were to accept the Fifth Circuit's view, of course, exigent circumstances would not be required to uphold the FPC's right to implement its new curtailment order.

The choice is between (1) ordering the reinstatement of the previous interim curtailment plan under Order No. 634, while remanding Order No. 697 in its entirety for reconsideration of environmental factors and the ultimate issuance of a permanent curtailment plan and environmental impact statement; and (2) approving the continued applicability of Order No. 697 (subject to the specific objections sustained elsewhere in this opinion) with the understanding that the Administrative Law Judge will have broad revision power to incorporate changes called for by environmental considerations.

■ As a matter of common sense, the latter is the less disruptive course. It should also vindicate NEPA's concern that major federal agency action be undertaken only when fully informed of environmental consequences. The Supreme Court, in an opinion subsequent to *ASARCO* and *Atlantic Gas*, has shed light on the practical approach that should be taken regarding the filing of environmental impact statements. In *Aberdeen & Rockfish Railroad Company v. SCRAP*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), the Court was presented with a request for an environmental impact statement in connection with proposed surcharges and general rate increases approved by the ICC. The Court held that a statement was not required until ICC approval of the railroads' proposals had actually been issued. "[T]he time at which the agency must prepare the final 'statement' is the time at which it makes a recommendation or report on a *proposal* for federal action." *Id.* at 320, 95 S.Ct. at 2356. *Cf. Kleppe v. Sierra Club*, 427 U.S. 390, 402, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

Still, it might be contended (and Salt River does so argue) that Opinion No. 697 was exactly what the Supreme Court had in mind as the type of agency recommendation on proposed federal action that would require an environmental impact statement. It is all the more instructive, therefore, to observe that the Court went on to say that, if "the ICC erred in failing to prepare a separate formal environmental impact statement to accompany its October 4, 1972, report or that the consideration given to

14. *See also Concerned About Trident v. Rumsfeld*, 180 U.S.App.D.C. 345, 351, 555 F.2d 817, 823 (1976).

environmental factors in that report was inadequate, the ICC need *not* have 'started over again.'" *Id.* at 321, 95 S.Ct. at 2356 (emphasis in original). Rather, a later consideration of environmental factors by the Commission before issuing its final order of approval would adequately accomplish NEPA's purpose. *Id.* at 322, 95 S.Ct. 2336.

The Supreme Court in *Aberdeen* had before it a record demonstrating that full attention was eventually paid to environmental considerations; whereas in the present case, the FPC has not yet made such a record. But that difference is not determinative. What is important is the approach taken by the Court in reconciling two potentially conflicting Congressional mandates—(1) that an agency not postpone those urgent decisions which its special qualifications require it to make in the public interest, and (2) that environmental considerations be taken account of to the fullest extent possible. Because of the breadth of scope and extent of permissible revision allotted to the Administrative Law Judge by the FPC on remand from that Commission, which we here sustain and emphasize, we believe the better course is to follow the example set in *Aberdeen*. The issuance of Order No. 697 (as modified by 697A) should not be held up pending an environmental impact statement.

## VII.   CONTRACT ABROGATION

■   Several petitioners object that the permanent curtailment plan, is allocating natural gas solely according to end-use, has improperly ignored the agreements reached by the parties themselves. The focus of complaint is that users are no longer characterized as firm or interruptible, with the former having priority over available natural gas supplies, and paying a higher price for that privilege.[15]   But this argument is not new. It was raised in challenging the interim curtailment plan before this court in *ASARCO*, which was also an end-use plan. *ASARCO, supra,* 161 U.S.App.D.C. at 16, 17, 494 F.2d at 935, 936. Both the legal permissibility of relying on end-use as an allocative scheme, and the substantiality of the evidence underlying the FPC's choice of the end-use method on the El Paso system, were upheld. In *Louisiana Power and Light, supra,* the Supreme Court held that the Natural Gas Act "fully authorized" the pipeline's tariff to impose a curtailment plan despite contrary terms in existing contracts and in so holding distinguished *United Gas Pipe Line Co. v. Mobil Gas Service Corp.*, 350 U.S. 332, 344, 76 S.Ct. 373, 100 L.Ed. 373 (1956). *See* 406 U.S. at 646–647, 92 S.Ct. 1827.

In Opinion No. 697, the Commission relies on the fact that regulations of the California Public Utilities Commission require natural gas service to be interruptible for industrial customers over 200 mcf per day. As a result, the informative function of an interruptible, as opposed to a firm contract, is somewhat distorted. It is not the free market allocating to the most productive user because that user can pay the highest price, but a government-imposed constraint upon the free market whereby at least some California users who would have paid to be firm-customers are subject to curtailment before EOC users. (J.A. 421–422; Tr. 16,-595–96).

It is not material, as petitioners urge on this court, that an actual instance of curtailment of California residential users in the face of continuing EOC industrial use has not yet arisen. The Commission acts within the scope of its discretion when it considers contingencies, for that is the nature of the emergency curtailment plans originally required by Order No. 431.

---

**15.**   As pointed out at oral argument, the customers being referred to are eventual users. Gas distributors are all interruptible to some degree, but can safely guarantee firm service to a certain number of eventual customers desiring it.

While fully within its authority in establishing categories of end-use, the Commission still paid slight attention to the efficient allocation reflected in firm and interruptible contracts. The Commission explicitly held that it was abrogating existing contractual entitlements only because and to the extent that they were not effectively serving this allocative function. (J.A. 422, Tr. 16596). As the Commission has impliedly adopted the premise that, in the absence of evidence of distortion, the distributive scheme worked out by private parties will accomplish the most efficient allocation of scarce resources, its declaration of priority categories based on end-use should allow for private contractual arrangements. Within end-use priority categories, there is still room for individual contracts to spring up, with some users requesting priority over others, and being willing to pay for it. Such arrangements would evidence that the parties themselves have agreed on a common unit for measuring their self-perceived needs. Hence, for example, if one manufacturing plant is able rather freely to substitute between natural gas and other fuels, it would not be willing to pay as much for the gas as would a second manufacturer whose operations entirely rely on energy from natural gas. Yet, under Opinion No. 697, both would be classified in Priority 3.

█ The Commission's present order should be read to allow natural gas consumers to contract for firm or interruptible fuel *within* priority classifications until the Commission rules otherwise. That interpretation is not precluded by any position taken by the FPC in its Opinion No. 697; rather, it is a necessary consequence of the Commission's statement that "the value of the 'firm-interruptible' contract distinction as a curtailment standard is thus largely dependent upon the accuracy with which it reflects the intensity of purchaser's need for gas." (Opinion No. 697, J.A. 422, Tr. 16596). To the extent that the California regulations require all service to be interruptible, the Commission in some areas may

desire to prohibit consumers from contracting for firm service even within priority categories. But that would only affect industrial use in excess of 200 mcf daily; and would require an explicit ruling by the Commission, if it so desires, on remand. For the present, nothing in Opinion No. 697 or 697A should be read to prohibit such contracting within priority categories.

## VIII. COMPENSATION

The permitting of contractual arrangements within end-use categories could also accomplish part of the purpose intended by those distributors, like Arizona Electric Power Company, who advocate that the Commission order a scheme of compensation from previously interruptible users who now enjoy a high priority classification to be paid to users whose needs are now classified in the lower categories. It is contended that such a system is obligatory in order to avoid discrimination in the new curtailment plan.

A question of jurisdiction is presented. The Commission holds that its authority to set rates under section 4 of the Act does not encompass the ability to require compensation payments from one class of users to another. That position has been squarely rejected by the Fifth Circuit. *Mississippi Public Service Commission v. FPC*, 522 F.2d 1345, 1350 (5th Cir. 1975), *cert. denied*, 429 U.S. 870, 97 S.Ct. 181, 50 L.Ed.2d 149 (1976). The question was also recently before a panel of this court in the context of the Transcontinental Gas Pipe Line curtailment. After vacation of our order and remand of the case from the Supreme Court, *FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976), the majority ordered a remand to the Commission to provide the evidence it felt was needed concerning the severity of the natural gas shortage before it could rule on the validity of the suggested compensation payments. *Transcontinen-*

tal *Gas Pipe Line Corporation v. Federal Power Commission*, 183 U.S.App.D.C. 145, 562 F.2d 664 (1976).

■ The suggestion for compensation payments is made in an entirely general way, with no specific plan proposed by the petitioners. Without judging the issue as it might be presented in a particular case of hardship (for which the Commission always stands ready to afford individual relief), the concept of a scheme of compensation cannot be decided on this record. It is only proposed in a general manner; and as a general proposal, it would be inconsistent with the entire purpose behind reallocation of natural gas to order compensation payments. More narrowly, all we hold is that nothing in the Natural Gas Act's instructions to the Commission to promulgate nondiscriminatory rates *requires* a compensation scheme.

A freely operating market would allocate natural gas first to those paying the most for it. It is the mandate of the Commission to intrude into that process where the social valuation on a particular use for natural gas exceeds the value to any one private person. To then force the private persons receiving the direct benefits from that reallocation to pay to the formerly favored users the difference in price between the favored and disfavored uses, however, defeats the entire rationale for the reallocation. If the newly favored users could afford to pay this compensation, they would in most instances have paid it at the start, and would have outbid the formerly favored users.

The California users could perhaps present a different case. There, an interruptible user might actually have placed a high value on the use of natural gas, but pays the lower rate in keeping with the interruptible status of industrial users over 200 mcf in California. Such a user, however, could not be in any priority above level 3; so it is quite unlikely that he would be enjoying a windfall benefit for which he

should be forced to compensate the EOC users. The FPC was not required to order such compensation.

We dispose of the compensation issue on this ground: that it is not required by the Natural Gas Act in order to avoid discrimination, that as a general matter, it would contradict the whole purpose for the end-use plan, but that the Commission will be free to consider compensation in particular cases subject to court review. We thus find it unnecessary in this case to reach the question of whether the Commission has jurisdiction to require compensation.

## IX. END–USE DATA

In making its allocations of natural gas to the distributors, El Paso has determined for each the amount of gas consumed within priority categories. To accomplish these calculations, it was necessary to rely on information furnished by the ultimate consumers as to the uses each made of natural gas. Arizona Electric Power Cooperative and the City of Willcox object to that method, especially because, "Since these nominations were made after El Paso's customers first suffered curtailment, they may well be tainted by self-serving exaggerations of requirements in higher priorities." (Brief for Petitioners City of Willcox and Arizona Electric Power Cooperative, Inc. at 53). The preferable practice, in petitioners' estimation, would be to require El Paso to obtain from each distributor actual data on residential, commercial, and industrial use of the natural gas furnished that distributor, and to subject those figures to cross-examination by competing distributors.

■ As large boiler users with firm contracts under the old scheme, such petitioners fear being reduced from top priority to near lowest priority in almost all of their natural gas allocations. It is expectable, accordingly, that they would like to scrutinize with the utmost care the claimed needs of distributors serving predominantly superior-priority users. But the decision of the

Commission being challenged here is of the type to which courts customarily accord a good deal of respect. It is not as though the Commission wishes El Paso to proceed without any data at all. If it had so ordered, that might have been so disruptive to the effective functioning of the Act as to have constituted an error of law. At the least, substantial evidence might well have been found lacking.[16] But the Commission has here merely chosen a method of obtaining the data necessary to implement its end-use curtailment plan. Absent a strong showing of unworkability, methodology is best left to an enforcing agency's own determination.

In the United Gas Pipe Line curtailment plan, reviewed in *Louisiana, supra,* the Commission did suspend the effective date of the end-use plan in order to obtain its own measurements of natural gas utilization by priority category. United Gas and El Paso could be distinguished on the basis of the high number of complaints received by the Commission in the former and, a related point, the relative novelty of the proposed plan compared with the plan that was already in force in *United.* However, on a matter of logistics rather than a rule of law, or even an agency's interpretive policy, the need to enforce consistency is much reduced. It is sufficient to hold that the Commission has taken a position that is not arbitrary, capricious, or an abuse of discretion in the El Paso curtailment plan. The position is that distributors' "nomina-

tions" will be presumptively accurate.[17] Should petitioners single out specific evidence of substantial abuse, where the "nominations" of natural gas use were fraudulently or negligently different from the priority classifications to which the natural gas was actually being put, then the Commission would be required to reconsider whether the "nomination" procedure was reliable.[18] At an earlier part of this opinion, we have relied (to the benefit of the petitioners) on the presumption the Commission's orders would not be evaded, and that it was impermissible for the designation of particular end use to turn on the unsubstantiated expectation of fraud.[19] This same presumption must operate here.

Also, any new program of estimation is likely to involve some inaccuracy. Given the wide range of consumers involved, the extensive geographical areas where they are located, and the magnitude of the operation, such result would be inevitable. The Commission, in its December 24, 1975, order, refused AEPCO's request to challenge SoCal gas nominations, admitting, "Although the data supplied with respect to SoCal is deficient, there is presently neither an allegation nor any evidence of error or impropriety with regard to its data or the data of PG & E." (Brief for Respondent at Appendix D, p. 11). This court agrees with the Commission that "[i]n the absence of such an allegation or evidence, we find no basis for requiring an investigatory hearing. . . ." (*Id.*)[20] It is no error to

---

**16.** 15 U.S.C. § 717r(b) (1970) provides in part: "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."

**17.** The presumption can be overcome in a hearing upon a motion by any gas distributing company, in accordance with 15 U.S.C. § 717d(a) (1970).

**18.** *See* note 17.

**19.** See discussion of gas turbines, 185 U.S. App.D.C. ——, 567 F.2d p. 407, *supra.*

**20.** Subsequent to oral argument, petitioners Willcox and AEPCO submitted a memorandum

pointing to what they considered to be an erroneous submission of evidence by one distributor, Arizona Public Service Company. In a special hearing on ignition and flame stabilization, APS had submitted an estimate of annual gas use equal to its maximum daily use multiplied by 365. On direct examination, the Company's attorney stated that a realistic estimate for annual use was many times less than that. Although heralding this as evidence of an egregious inconsistency requiring the adoption of formal actual use surveying, AEPCO has merely located one example, among many that are inevitable, of a misunderstanding between data requested and data furnished. Had APS been bent on fraud, it is doubtful that it would have

proceed under the assumptions that the laws against fraud are being obeyed,[21] and that the possibility of innocent errors may be weighed against the delays and costs of detailed hearings.

## X. CONCLUSION

It is with great reluctance that this court remands the instant case for still more deliberation by the Federal Power Commission. This would not have been necessary, in large part, had the orders of this court in *ASARCO* been fully complied with. The Commission has itself realized, however, that Opinion No. 697 (as modified by Opinion No. 697A) is not ready for implementation as a permanent plan because of the need for resolution of the environmental issues. The Commission will now have more issues to concern itself with during those deliberations. But that could be advantageous in allowing a greater freedom, as a practical matter, to structure a curtailment plan with more concern for environmental matters from the ground up, rather than as an afterthought.

We have carefully considered the many challenges raised against the El Paso curtailment plan, but have not devoted particular attention in this opinion to all of them. It is our decision that any challenges not specifically addressed be dismissed as insubstantial. This case is remanded to the Federal Power Commission with instructions to implement the holdings of this opinion in revising Opinion 697 (as modified by Opin-

ion No. 697A). In brief summary,[22] those holdings are:

1) fuel devoted to ignition and flame stabilization must receive Priority 2 status (Part II);

2) electricity generating turbines must not be classified with boilers, in Priorities 4 and 5, but are entitled to a higher priority (Part III);

3) attachments of new users up to December 19, 1974, must be incorporated in measuring uses by priority classification during the base period (Part IV);

4) pre-existing shortages of natural gas in California during the base period must be considered in determining California's volumetric entitlement (Part IV); and

5) gas used from storage facilities must be taken into account (i) to the extent its source has been from El Paso, (ii) in proportion to the actual end use of such storage gas, (iii) and with safeguards against according priority to gas both as it is pumped into storage and as it is withdrawn therefrom (Part V).

*So ordered.*

BAZELON, Chief Judge, concurring in part, dissenting in part:

I agree with the result reached by the majority, remanding the El Paso final curtailment plan to the Federal Power Commission, and concur generally with much of

---

attempted it on so grand a scale as to receive 23 times the amount to which it was entitled of natural gas in the high priority use. Perhaps such errors would be noticed more frequently if adverse parties were permitted to challenge data submissions, but it is for the Commission to weigh that likelihood against the burden of adversary proceedings on such minute details.

**21.** Falsification of information required by the Federal Power Commission to be furnished to El Paso would constitute a violation of 15 U.S.C. § 717t(b) (1970): "Any person who willfully and knowingly violates any rule, regulation, restriction, condition, or order made or

imposed by the Commission under authority of this chapter, shall, in addition to any other penalties provided by law, be punished upon conviction thereof by a fine of not exceeding $500 for each and every day during which such offense occurs."

Such conduct might also result in wilfully causing El Paso to make a false statement to the United States Government in violation of 18 U.S.C. § 1001 (1970).

**22.** To the extent that the following are abbreviations of directions outlined in greater detail above, the more complete directions shall prevail.

its opinion. I take exception, however, to the majority's discussion of three specific elements of the plan:

### 1) Utilization of Gas for Electric Turbines

In Opinions No. 697 & 697–A, the Commission has determined that the use of natural gas as boiler fuel should have a lower priority than other end uses; the Commission has also determined that the use of gas to power turbines which generate electricity should be considered boiler-fuel use, and accorded the same low priority. The majority affirms the priority given boiler fuel, but rejects the Commission's conclusion with respect to gas used in turbines for electric generation. I would affirm both portions of the Commission's decision. As the majority points out, Maj.Op. 185 U.S. App.D.C. at ——, 567 F.2d at 402, the Commission has found that turbine use is even less efficient than other sorts of "boiler fuel" use. J.A. 100. Since, as the majority virtually concedes, this finding is supported by substantial evidence, the Commission's decision must be affirmed. *See Mobil Oil Co. v. FPC,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974).[1]

The challenge to the Commission's decision with respect to turbine use was raised principally by Arizona Electric Power Cooperative [AEPCO], which, in its brief, repeatedly refers to its situation as "unique." Whatever injury AEPCO has suffered because of its allegedly unique situation could be adequately redressed by reclassification or an increased gas allotment, if appropriate, by petitioning for extraordinary relief.

### 2) Pre-existing Shortage in California

I agree with the court that remand to adjust base period data to account for after-acquired attachments of new (mostly high priority) users up to December 19, 1974, is proper. However, I disagree with the majority that the Commission's consideration of pre-existing shortages of local and non-El Paso gas in California was insufficient, Maj.Op. 185 U.S.App.D.C. at —— —— ——, 567 F.2d at 403, and I see no need for remand for further consideration of that issue.

The record shows that the two California customers of El Paso, Pacific Gas & Electric Company and Southern California Gas Company, were partial requirements customers of the pipeline; that is, both had other suppliers than El Paso during and before the base period for computing volumetric entitlements. As the court acknowledges, Maj.Op. 185 U.S.App.D.C. at ——, 567 F.2d at 410, the Commission in Opinion No. 697 specifically discussed the question of pre-existing shortages suffered by these partial requirements customers due to reduced deliveries by their other suppliers. J.A. 434–39. However, the court feels that consideration fell "far short of providing a basis for justifying the FPC's failure to provide some relief to the California users . . . ." Maj.Op. 185 U.S.App.D.C. at ——, 567 F.2d at 410.

Unlike the majority, I believe the Commission has complied with the terms of our remand in *American Smelting & Refining Co. v. FPC,* 161 U.S.App.D.C. 6, 23, 494 F.2d 925, 942 (1974), *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974) [*ASARCO*]. The *ASARCO* court required that the Commission "consider the pre-existing shortages in California and . . . enunciate findings with respect to that situation". *Id.* The Commission has responded by reviewing the matter and relying upon two rational policies developed earlier and consistently applied here.

In Opinion No. 697 the Commission cited its earlier Opinion No. 647, in which it enunciated an approach of "allocat[ing] the

---

1. Without in any way urging it as a ground for decision, I note that the proposed national energy policy, S.1468, 95th Cong., 1st Sess.

(1977), favors conversion from natural gas to coal by utilities engaged in the generation of electricity.

impact of curtailment equally, insofar as may be possible, upon full and partial requirements customers treating both in the same manner." J.A. 435, citing Opinion No. 647, at 14. The Commission therein noted:

modification of our treatment of partial requirements customers might be necessary to protect small volume residential service in the event of extraordinarily severe shortages requiring curtailment in the highest priority categories.

*Id.* Under this exception for severe hardship, some full or partial requirements customers of a curtailed pipeline would be more severely curtailed so that a partial requirements customer could offset other shortages. Here, however, the Commission found:

In reviewing the record in the instant proceeding, we find no indication that the reduced supplies available to the California partial requirements customers from sources other than El Paso, in combination with a curtailment of entitlements from El Paso prorated equally . . . will result in a shortage of such severity as to warrant special treatment for the partial requirements customers.

J.A. 435. Moreover, the Commission has indicated that its general policy for regulating curtailments [2] contemplates pipeline-by-pipeline regulation. Therefore, a partial requirement customer impacted by curtailment on each of its supplier pipelines cannot ordinarily expect any one of those suppliers to make whole the customer's shortfall. Because a partial requirements customer's expectations from any given supplier may respond elastically to shortages and oversupply, the Commission has chosen here to base future entitlements upon past volumes taken from El Paso. It subverts the Commission policies of equal curtailment of full and partial requirements customers and pipeline-by-pipeline regulation to suggest, as the court does, that the two California customers' historic takes must now be disregarded in favor of spongy estimates of the volumes which would have been taken had customers been allowed to lean more heavily upon El Paso to overcome other supply shortages.

This court recently affirmed a Commission decision not to permit a municipality to interconnect with an interstate pipeline and thereby obtain an allocation of its gas offsetting curtailments by the municipality's own interstate pipeline supplier. *City of Huntingburg v. FPC,* 180 U.S.App.D.C. 96, 555 F.2d 1033 (1977). As applied to a partial requirements customer of several interstate pipelines, that decision seems to buttress the Commission policy of pro rata curtailment of all customers by pipeline within end-use categories. Because California customers could use or procure alternative fuels to make up their deficits, and were not in a worse position to do so than East-of-California customers, the Commission refused to permit exception to its policy against allowing adjustments to the El Paso entitlements to take up the slack. This, it seems to me, was reasonable and comports with the decision in *Mobil, supra.* I would affirm the Commission on this issue.

### 3. *Compensation*

I find most troubling the majority's extended discussion of "compensation schemes"—i. e., plans whereby those pipeline customers who are relatively less affected by curtailment would be required to provide cash compensation to those customers relatively more affected. I agree with the majority's narrow holding on this subject, namely, that in the absence of a definite plan offered (or agreed to) by the parties, the Commission did not err in refusing sua sponte to fashion a compensation plan. In my view, however, much of the majority's discussion of compensation is irrelevant to this case, and unnecessary to its holding. In particular, I see no need for us to reach the broader issue—with which we grappled in *Transcontinental Gas Pipe Line*

---

**2.** Orders 467 & 467–B, codified as 18 C.F.R. § 2.78.

*Corp. v. FPC,* 183 U.S.App.D.C. 145, 562 F.2d 664 (1976) [*Transco*]—of whether the Commission has authority under the Natural Gas Act to approve and regulate compensation among distributor customers of a jurisdictional pipeline. The issue raised in *Transco* was permissive in nature—*i. e.,* does the Natural Gas Act *allow* compensation which has been agreed to by the parties, or does it flatly bar it on jurisdictional grounds? The majority there held that factual material about the nature and duration of shortage was necessary to guide the court in its interpretation of the statutory standards of "just and reasonable" and "non-discriminatory" rates in the novel context of alleged extreme shortage and allocation by end-use priorities. Here, the question posed is a simpler mandatory one: Does the Act *require* compensation in conjunction with end-use curtailment, and does it therefore preclude the Commission from approving a final curtailment plan based upon end-use without providing compensation? I have little difficulty answering this latter question in the negative, and I therefore join the court's holding that "nothing in the Natural Gas Act's instructions to the Commission to promulgate non-discriminatory rates requires a compensation scheme," where the Commission believes justice can be done without one, and none has been endorsed by the parties.

On Motions for Clarification and/or Stay and on Petitions for Rehearing

ORDER

PER CURIAM.

Upon consideration of the motion of petitioners in Appeal No. 74–2123 for stay in the second interim curtailment plan, the responses thereto, said petitioners' reply, and the answer of petitioner, Southern California Gas Company to the reply, it is

ORDERED, by the Court that the motion for stay is denied for the reasons set forth in the opinion for the court filed this date.

ORDER

Upon consideration of the motion of Intervenor, Salt River Project Agricultural Improvement and Power District for clarification of this court's opinion, it is

ORDERED, by the Court, that the motion is denied for the reasons set forth in the opinion for the court filed this date.

ORDER

Upon consideration of the petitions for rehearing filed by Petitioners in Appeal No. 74–2123 and by Intervenors, El Paso Natural Gas Co., and Pacific Gas and Electric Co., it is

ORDERED by the Court that the aforesaid petitions are denied.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

On June 30, 1977, this court decided *City of Willcox, et al. v. Federal Power Commission,* No. 74–2123 et al. In that case, we reviewed an interim curtailment plan for deliveries of natural gas on the El Paso Natural Gas System. This plan, which was formulated in Federal Power Commission Opinion Nos. 697 and 697A, was found deficient in five respects. We remanded the case to the Commission with instructions to implement our holdings regarding those deficiencies. 185 U.S.App.D.C. at ——, 567 F.2d at 422.

On June 1, 1977, the Commission issued *Order Denying Rehearing and Accepting Tariff Sheets,* which had the effect of directing the implementation on July 1, 1977 of the interim curtailment plan which was the subject of our June 30, 1977 opinion. On July 14, 1977, the City of Willcox (Willcox) and Arizona Electric Power Cooperative, Inc. (AEPCO) petitioned this court to stay the FPC's June 1, 1977 order.

On July 12, 1977, Salt River Project Agricultural Improvement and Power District (Salt River) presented a motion for clarification of our June 30, 1977 opinion. Several other parties have also each petitioned for rehearing on certain aspects of our opinion.[1]

■ We take judicial notice of the FPC's *Order Denying Motion for Stay, Granting Rehearing, Modifying Curtailment Plan, Establishing Further Hearings, Consolidating Hearings, and Requiring Action to Obtain Remand of Record*, issued July 29, 1977. The Commission ordered the interim curtailment plan developed in Opinion Nos. 697 and 697A[2] to remain in effect, subject to certain modifications we ordered in *City of Willcox*. Specifically, the Commission directed that fuel devoted to ignition and flame stabilization remain in Priority 2 status[3] (*see* 185 U.S.App.D.C. at ———–———, at 404–405, 422 of 567 *F*.2d); that electricity-generating turbine fuel be placed in Priority 3 rather than Priorities 4 and 5 (*see* 185 U.S.App.D.C. at ———–———, ———, 567 F.2d at 405–408, 422); and that attachments of new residential and commercial users up to December 19, 1974 be included in base period requirements (*see* 185 U.S.App.D.C. at ———–———, ———, 567 F. 2d at 408–410, 411). The Commission also directed that hearings be held to provide a record for determining (1) whether electricity-generating turbine fuel should be reclassified from Priority 3; (2) whether Arizona Public Service Co. and Tucson Gas and Electric Co: were dilatory in obtaining state permission to reject new customers after December, 1974, and whether an additional base period adjustment should be permitted these customers for attachments occurring between December 19, 1974 and the date of

state imposition of a new attachment moratorium (*see* 185 U.S.App.D.C. at ———, 567 F.2d at 409, 411); (3) how to take into account pre-existing shortages of natural gas in California during the base period when determining California's volumetric entitlement (*see* 185 U.S.App.D.C. at ———–———, ———, 567 F.2d at 408–412, 422); and (4) how to allocate storage injection volumes in accordance with the requirements we elucidated in *City of Willcox* (*see* 185 U.S. App.D.C. at ———–———, ———, 567 F.2d at 412–414, 422). In short, as a result of the Commission's July 29, 1977 order, all of the modifications of the interim curtailment plan that we ordered in *City of Willcox* have either been implemented or will be the subject of hearings to determine how they should be implemented.

■ We now turn to the various motions and petitions. Salt River, AEPCO, and Willcox, in their motions for clarification and/or stay, urge that electricity-generating turbine fuel be reclassified to Priority 3 from Priorities 4 and 5. Because the Commission has already implemented this reclassification, the motions of these parties for this modification are moot and are therefore denied.

■ As an independent ground for a stay of the interim curtailment plan, Willcox and AEPCO assert a great interest in lowering the California users' storage priority, pending the Commission's compliance with our mandate to establish a storage priority scheme whereby "the priority accorded to natural gas kept in storage be in proportion to the eventual end uses of that gas . . . ." 185 U.S.App.D.C. at ———, 567 F.2d at 414. The FPC's July 29, 1977 order directs that hearings be held on

---

1. These parties are Willcox, AEPCO, Pacific Gas and Electric Co., and El Paso Natural Gas Co.

2. Opinion Nos. 697 and 697A were clarified in orders issued December 24, 1975, October 15, 1976, and June 1, 1977.

3. Fuel devoted to ignition and flame stabilization was placed in Priority 2 status by *Order Denying Rehearing, Further Clarifying Opinions, and Requiring Modification of Proposed Tariff Sheets*, issued October 15, 1976, Paragraph (E).

this specific matter. It has scarcely been two months since our decision in *City of Willcox*; accordingly, we believe it would be premature to interrupt the Commission's deliverations at this time. The Commission has recognized that it cannot implement the plan described in Opinion Nos. 697 and 697A on a permanent basis without modification. This is evidenced by the fact that the Commission has altered the plan in certain respects already and is taking steps to gather information with which other modifications can be made. Under the power conferred on the Commission "to prescribe . . . such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions" of the act,[4] it is open to the Commission to order appropriate interim priorities pending further hearings. The Commission here is dealing with a tariff; in such matters, the statute vests the Commission with the discretion to allow the tariff to become effective immediately or to suspend. The discretion conferred recognizes the acquired knowledge and experience of the agency in matters committed to its regulation and is a sufficient basis for recognizing its authority to prescribe interim priorities during the short period preceding hearings on storage volumes and the other matters awaiting implementation.

It should also be realized that none of the present petitioners alleges that a curtailment of natural gas is currently in effect. Lower priorities which certain users might enjoy until the Commission completes hearings and orders further modification will have no deleterious impact unless curtailment actually occurs.[5] Should curtailment occur and El Paso cut off any user entitled by the opinion of this court not to be cut off, that party could either petition the Federal Power Commission to implement our opinion, in keeping with 15 U.S.C. § 717s(a) (1970),[6] or following denial of rehearing seek an immediate stay from this court should the Commission not choose to proceed, under 15 U.S.C. § 717r(a) (1970).[7]

---

4. The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified therein, rules and regulations of the Commission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours.
15 U.S.C. § 717*o* (1970).

5. Should it be determined by the Commission after hearings that the California users' storage priority is too high, the Commission can order reallocation in accordance with its new findings.

6. (a) Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper district court of the United States, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices or concerning apparent violations of the Federal antitrust laws to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings.
15 U.S.C. § 717s(a) (1970).

7. (a) Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, munici-

In the latter instance, the "order" by which the complainant would be "aggrieved" would be the Commission's approval of the interim curtailment plan. However, until there is actual curtailment, or at least a more than speculative threat that the Commission will not abide by our opinion in the event of curtailment, no party is presently "aggrieved."

Granting the motion to lower immediately the California users' storage priority would constitute precedent for petitioning this court for advisory opinions as to how our decision might apply to various parties. Such decisions are not permitted. No case of immediate harm is presented, and the proper procedure is to afford the Commission the opportunity to implement the decision of this court.

We also take this opportunity to clear up a possible ambiguity, concerning storage gas, that has been pointed out by Pacific Gas & Electric Co., El Paso Natural Gas Co., and Southern California Gas Co. Nothing we have said in our June 30, 1977, opinion should be taken to prevent the Commission, on remand, from finding that storage gas serves high priority uses. The point made in our opinion of June 30, 1977, was simply that, to the extent storage gas is made available to higher priority uses, more non-storage gas will be available to the lower priority uses. We reiterate our holding on storage utilization of natural gas:

In revising its permanent curtailment plan for the El Paso system, the Commission must guarantee: 1) That all use of El Paso-originating natural gas (whether detained in storage for a period of time or not) be recognized in setting the percentage reliance of California customers upon El Paso. 2) That double counting be avoided either by considering the El Paso origin of the natural gas as it is injected into storage, or as it is withdrawn from storage, but not both. 3) That the priority accorded to natural gas kept in storage be in proportion to the eventual end uses of that gas, unless the Commission wishes to support with an evidentiary hearing the importance of storage gas irrespective of the end use to which it is eventually put.

185 U.S.App.D.C. at ——, 567 F.2d at 414. This clarification obviates any need for rehearing.

The motions of Salt River, Willcox, and AEPCO for clarification and/or stay are denied. The motions of Willcox, Pacific Gas & Electric Co., El Paso Natural Gas Co., and Southern California Gas Co. for rehearing are denied.

*Order accordingly.*

pality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

15 U.S.C. § 717r(a) (1970).